PEOPLE v CHEATHAM

Docket No. 102201. Argued March 6, 1996 (Calendar No. 13). Decided
    July 30, 1996.
    Willie C. Cheatham was charged in the Detroit Recorder's Court with
        first-degree murder and possession of a firearm during the commis-
        sion of a felony. Before trial, the court, Clarice Jobes, J., denied the
        defendant's motion to suppress two statements given to the police
        after being apprised of his *Miranda* rights, concluding that his
        waiver of his *Miranda* rights was valid. Thereafter, Cheatham was
        convicted of second-degree murder and felony-firearm. The Court
        of Appeals, DOCTOROFF, C.J., and T. G. KAVANAGH and R C. LIVO, JJ.,
        reversed in an unpublished opinion per curiam and remanded the
        case for a new trial, finding that, regardless of the lack of coercive
        police conduct, the defendant did not have the intellectual ability
        to understand his rights, and, thus, his waiver was invalid and his
        confession should have been suppressed (Docket No. 155010). The
        people appeal.
        In an opinion by Justice BOYLE, joined by Chief Justice BRICKLEY,
    and Justice RILEY, and an opinion by Justice WEAVER, the Supreme
    Court *held*:
        The state fulfilled its burden of proving that the defendant suffi-
    ciently understood the *Miranda* warnings given to him and that his
    subsequent wavier was valid.
        1. Whether a suspect has validly waived *Miranda* rights depends
    in each case on the totality of the circumstances surrounding the
    interrogation. The burden is on the state to prove by a preponder-
    ance of the evidence that the suspect properly waived *Miranda*
    rights. In this case, the defendant does not contend that his confes-
    sion was involuntary, and his testimony at the suppression hearing
    clearly indicates a lack of coercion surrounding his confession. To
    knowingly waive *Miranda* rights, a suspect need not understand
    the ramifications and consequences of choosing to waive or exer-
    cise the rights that the police have properly explained. Lack of
    foresight is insufficient to render an otherwise proper waiver
    invalid. To establish a valid waiver as a matter of law, the state
    must present evidence sufficient to demonstrate that the accused
    understood the right not to speak, the right to the presence of

counsel, and that the state could use any statement by the accused in a later trial. The waiver also must be knowing and intelligent under the totality of the circumstances. To knowingly waive *Miranda* rights, an accused need not understand the ramifications and consequences of choosing to waive or exercise the rights that the police have properly explained. Absent police coercion, a defendant's mental state alone can never render a confession involuntary. Credibility is crucial in determining a defendant's level of comprehension, and the trial judge is in the best position to make this assessment.

2. In this case, the trial judge correctly determined that the defendant knowingly and intelligently waived his rights. The defendant was able to engage in a calculated attempt to testify about what he thought would benefit him at the suppression hearing, the waiver form provided appropriate background information, he knew the police intended to use his statement against him, and he had learned from his previous interaction with the police. At the end of the suppression hearing, the trial judge concluded that there was no issue of coercion regarding the defendant's statement, that he wanted to tell the police what happened, and that he sufficiently understood his rights. The conclusion was not clearly erroneous.

Justice CAVANAGH, concurring in part, stated that the only issue actually before the Supreme Court is whether the defendant's waiver of his Fifth Amendment rights was knowing and intelligent and therefore valid. The lead opinion unnecessarily discusses and decides issues not actually presented in this appeal. Accordingly, its assertions in regard to these issues are mere dicta and have no precedential authority for future cases. Furthermore, its attempt to immutably link interpretation of the Michigan Constitution to the United States Supreme Court's interpretation of analogous provisions of the federal constitution, as a general rule, is wholly unsupported by Michigan case law. Also unnecessary to the analysis is the lead opinion's discussion of the voluntariness prong of a *Miranda* waiver analysis, which, through a tendentious survey of federal cases, it attempts to conflate with the "knowing and intelligent" prong.

*Miranda* enunciated the knowing and intelligent prong of a waiver analysis, but it was not the first case in which the United States Supreme Court imposed rules on state courts to protect against the use of involuntary confessions. *Miranda* explained that a waiver must be voluntarily, knowingly and intelligently made, and subsequent United States Supreme Court case law has dispelled any notion that a *Miranda* waiver must be caused by coercive police misconduct to be deemed unknowing.

It is logically inconsistent to attempt to apply the notion of police coercion to an inquiry of what a suspect understood. The relevance of coercion to a voluntariness inquiry is obvious and unmistakable; however, the concept of coercion or compulsion bears no relation, logically or otherwise, to a suspect's level of comprehension of the rights at issue. Coercive police conduct is as necessary to a finding of involuntariness under *Miranda* as it is under the substantive protection of the Fourteenth Amendment Due Process Clause. It is only with respect to the completely distinct "knowing and intelligent" prong of a *Miranda* waiver analysis—a prong never considered under the pre-*Miranda* due process analysis—that coercive police conduct is not required, either by logic or by law.

Before the Fifth Amendment was incorporated into the Fourteenth, the only substantive protection afforded by the Fourteenth Amendment was the prohibition against coercive police conduct that rendered a suspect's confession or other statement involuntary and therefore inadmissible. But ever since *Miranda*, the Self-Incrimination Clause of the Fifth Amendment, which was incorporated into the Fourteenth Amendment, has been understood to require that a suspect's decision to waive Fifth Amendment rights be both voluntary and knowing and intelligent. Thus, the substantive content of, and the substantive protections afforded by, the Fourteenth Amendment are greater after incorporation than they were before.

The lead opinion also mischaracterizes the relevant case law with regard to the specific issue of police conduct. Both the voluntary and the knowing and intelligent prongs must be analyzed under the totality of the circumstances surrounding the interrogation, and therefore any relevant police conduct would be equally applicable. There is no requirement for evidence of police conduct of any particular sort to find a waiver invalid under the knowing and intelligent prong, but any police conduct that could have an effect on a suspect's requisite level of comprehension must be factored into the analysis. The initial judicial focus under the knowing and intelligent prong is what information was or was not conveyed to the suspect, and how that information affected the suspect's comprehension of the guarantees of the Fifth Amendment. Though the ultimate focus for purposes of the knowing and intelligent prong remains on the level of the suspect's comprehension, it is clear that police conduct can be relevant.

Any discussion of the exclusionary rule is unrelated to this case and therefore is mere dicta. Because the defendant's waiver was valid, the issue of exclusion is in no way implicated. Deterrence of

coercive police conduct is by definition inapposite to whether a *Miranda* waiver was invalid because it was not knowing and intelligent. However, if a suspect's *Miranda* waiver was not knowing and intelligent because of police conduct that deprived a defendant of knowledge essential to the ability to understand the nature of the rights and the consequences of abandoning them, deterrence would be directly apposite. Deterrence is not the overarching consideration; rather, it is the protection and vindication of constitutional rights.

Justice MALLETT, concurring, stated that the decision in this case should not be interpreted as endorsing the standard *Miranda* litany as sufficient to secure a waiver from persons with impaired or below normal mental abilities. The requirement that a waiver of *Miranda* rights be knowingly and intelligently made means that an officer securing the waiver must explain the rights so as to assure that the person waiving the rights truly understands. The officer should use caution and good faith in assessing a suspect's level of understanding. The focus of inquiry must be on the plain meaning of the warnings; the validity of a waiver does not depend on a verbatim recitation of the *Miranda* litany, but rather on an actual understanding of the *Miranda* rights and the consequences of waiving them.

Reversed and remanded.

Justice LEVIN, dissenting, stated that he agreed with the Court of Appeals that the trial court made a mistake in finding that the defendant knowingly waived his *Miranda* rights; the defendant did not have the intellectual ability to understand his rights because he was mentally retarded and functionally illiterate, and demonstrated an inability to understand complex questions; the admission of his statement is not harmless error.

*Frank J. Kelley*, Attorney General, *Thomas L. Casey*, Solicitor General, *John D. O'Hair*, Prosecuting Attorney, *Timothy A. Baughman*, Chief, Research, Training and Appeals, and *Jeffrey Caminsky*, Assistant Prosecuting Attorney, for the people.

*Gerald S. Surowiec* for the defendant.

Amicus Curiae:

*Krause & Zambon, P.C.* (by *Tonya L. Krause*), for Criminal Defense Attorneys of Michigan.

BOYLE, J. We granted leave in this case to determine whether the state has carried its burden of establishing that defendant validly waived his *Miranda*[1] rights. There is no dispute that the waiver was voluntary. The question presented is whether the waiver was "knowing and intelligent." We conclude that the state has fulfilled its burden of proving that defendant sufficiently understood the warnings given to him and that his subsequent waiver was valid. Thus, we would reverse the decision of the Court of Appeals.

I

Defendant Willie Cheatham and codefendant Joseph Stringer were jointly tried on first-degree murder[2] and felony-firearm[3] charges. The two defendants had separate juries who heard different evidence and reached different outcomes. Stringer was acquitted on the murder charge, but convicted of possession of a firearm during the commission of a felony; defendant was convicted of the lesser crime of second-degree murder[4] and felony-firearm. Among the critical pieces of evidence heard by defendant's jury, but not by Stringer's jury, was defendant's statement admitting his presence at the murder scene and acknowledging that he threw a gun into an alleyway.

The charges stem from a murder in the City of Detroit on October 26, 1991. About 9:30 P.M., the police were summoned to a house where they discovered the decedent, Dewone Ridley, lying on the floor with three gunshot wounds.

---

[1] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).
[2] MCL 750.316; MSA 28.548.
[3] MCL 750.227b; MSA 28.424(2).
[4] MCL 750.317; MSA 28.549.

A short distance away from the house where Ridley was discovered, the police were investigating an automobile accident in which a car had run into a building. The police found Stringer slumped over the steering wheel of the car, unconscious, with bullet wounds of the chest and leg, and with a .45 caliber pistol near his feet. Further down the block from the accident, the police observed defendant with blood on his head and inquired whether he had been in the car. Defendant responded that he had, and the police, after sending him to the hospital, took him into custody. During a patdown search, five empty .38 caliber shells were found in defendant's pocket.

While in custody, defendant gave two slightly different statements to the police. After being advised of and waiving his *Miranda* rights, defendant in his first statement said that Stringer had offered to give him a ride home and he accepted the offer. On the way, Stringer stopped at a house and got out of the car; defendant stayed in the car. While waiting in the car, defendant heard a door being kicked in, which was quickly followed by the sound of gunshots. Shortly thereafter, Stringer returned to the car with blood on his leg and a .45 caliber gun in his hand. Defendant stated that he did not have a gun.

In his second statement, again after being properly informed of and waiving his *Miranda* rights, defendant repeated that Stringer was giving him a ride home and had stopped at a house on the way. Stringer got out of the car with a .45 caliber pistol in his hand and headed toward the house. Defendant then heard a door being kicked in and shots being fired. Contrary to his previous statement, defendant in this statement claimed to have gotten out of the car at this point and

walked onto the porch of the house. As he was stand-
ing on the porch, defendant saw Stringer shoot Ridley
three times. Defendant returned to the car, and a few
seconds later Stringer, with blood on his leg, got into
the car and drove toward the hospital. Before reach-
ing the hospital, Stringer lost control and the car hit a
building. Defendant struck his head on the windshield
during the accident, but was able to get out of the car
and throw the .38 caliber revolver he was carrying
into an alley. Defendant said that he threw his gun
into the alley because he had been arrested before
with a gun and was afraid that he would have to go
back to jail.

Before trial, defendant sought to have both state-
ments suppressed.[5] At the suppression hearing, Dr.
Steven Miller, a forensic psychologist, testified that he
had examined defendant. Defendant had a history of
being in special education classes and had dropped
out of school in the ninth grade. Defendant had told
Miller that he had no prior contact with the police
and that he could not read or write. On the basis of
several psychological tests, Miller concluded that
defendant has an IQ of sixty-two and that he did not
believe defendant was competent to waive his
*Miranda* rights.

At the suppression hearing, defendant testified that
at the time he gave his statements he did not know
what it meant to be "silent," or what the word "attor-
ney" meant. Defendant did agree, however, that he
knew he did not have to tell the police anything, that
he wanted to tell the police what happened, that the

---

[5] The testimony presented at the suppression hearing, which is summa-
rized here, is set forth in detail later in the opinion.

officers had informed him of his *Miranda* rights, and that he told the officers he understood his rights.

The police officer who questioned defendant the second time, Sergeant Arlie Lovier, testified that he did not have any problems communicating with defendant and that it appeared defendant understood what he was saying. Lovier stated that, after learning defendant was unable to read, he read defendant his *Miranda* rights. After reading each right, he asked defendant to place his initials next to the right if he understood what the right meant. Defendant initialed each right and signed the statement at the end, agreeing that he had been informed of and understood his rights.

At the conclusion of the suppression hearing, the trial judge concluded that there was no coercion on the part of the police and that defendant had not been forthright with Miller when he claimed he had no previous contact with law enforcement.[6] The trial judge further found that defendant's confession was wholly voluntary and that the only issue was whether defendant understood his rights. Although noting that defendant was intellectually limited and could not read, the judge concluded that his understanding of the *Miranda* rights was sufficient for a valid waiver.

On appeal, the Court of Appeals disagreed with the trial judge's determination regarding defendant's cognitive abilities. The Court, citing *People v Garwood*, 205 Mich App 553; 517 NW2d 843 (1994), found that, regardless of the lack of coercive police conduct, defendant did not have the intellectual ability to

---

[6] Defendant had previously been arrested for carrying a concealed weapon.

understand his rights and thus his waiver was invalid and his confession should have been suppressed.[7]

The prosecutor sought leave to appeal, and we granted the application on October 10, 1995. 450 Mich 874.

II

A

The Fifth Amendment[8] of the United States Constitution guarantees that the government cannot compel a defendant in a criminal case to testify against himself.[9] This protection has been applied to the states through the Due Process Clause of the Fourteenth Amendment. *Malloy v Hogan*, 378 US 1; 84 S Ct 1489; 12 L Ed 2d 653 (1964). In addition, art 1, § 17 of the Michigan Constitution affords defendants a corresponding state constitutional right to be free from compelled self-incrimination.[10]

---

[7] Unpublished opinion per curiam, issued January 11, 1995 (Docket No. 155010).

[8] This case does not implicate the defendant's right to counsel under the Sixth Amendment of the United States Constitution or his corresponding state right under Const 1963, art 1, § 20, because "that right attaches only at or after the initiation of adversary judicial proceedings by way of formal charge, preliminary hearing, indictment, information, or arraignment." *People v Wright*, 441 Mich 140, 173; 490 NW2d 351 (1992) (RILEY, J., dissenting); *Moran v Burbine*, 475 US 412, 430; 106 S Ct 1135; 89 L Ed 2d 410 (1986).

[9] The Fifth Amendment states:

No person . . . shall be compelled in any Criminal Case to be a witness against himself . . . .

[10] Const 1963, art 1, § 17 states:

No person shall be compelled in any criminal case to be a witness against himself . . . .

The wording of the Michigan Constitution granting protection from compelled self-incrimination is identical to the Fifth Amendment protection. Recently, this Court examined the relationship between the Fifth Amendment and art 1, § 17 in *People v Wright*, 441 Mich 140; 490 NW2d 351 (1992), but could not reach a consensus regarding that relationship. We do not face the issue that separated the Court in *Wright*, and there is no need in this case to construe the protection against self-incrimination found in the Michigan Constitution differently from the identical federal guarantee.[11] On the facts of this case, if defendant's Fifth Amendment right to be free from compelled self-incrimination was not violated, neither was a corresponding right under art 1, § 17 of the Michigan Constitution.

B

In *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966), the United States Supreme Court created a set of prophylactic safeguards to insure protection of the Fifth Amendment right to be free from compelled self-incrimination during custodial interrogation.[12] The stated goal of *Miranda* is to protect

---

[11] Defendant claims that his waiver was not knowing and intelligent under both the Fifth Amendment of the United States Constitution and art 1, § 17 of the Michigan Constitution, but does not provide any reason or analysis for a different construction. See *Sitz v State Police Dep't*, 443 Mich 744; 506 NW2d 209 (1993).

[12] As Professor Grano notes in his recent book, contrary to a popular misconception that is perpetuated by imprecise language in judicial opinions:

The Fifth Amendment confers a right not to be compelled to answer questions; it does not confer a substantive or formal right of silence. Concededly, the former right does give rise to a right of silence in "the very weak sense" that a person has "a right to

against the inherently coercive nature of custodial interrogation. *Id.* at 467.

> *Miranda* protects defendants against governmental coercion leading them to surrender rights protected by the Fifth Amendment; it goes no further than that. [*Colorado v Connelly*, 479 US 157, 170; 107 S Ct 515; 93 L Ed 2d 473 (1986).]

In an attempt to dissipate the coercion found to be inherent in custodial interrogation, thus protecting a defendant's Fifth Amendment right, the *Miranda* Court created the familiar litany:

> To summarize, we hold that when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, . . . [h]e must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to questioning if he so desires. [*Id.* at 478-479.]

The United States Supreme Court, both in *Miranda* and in its progeny, has repeatedly stated that the warnings delineated in *Miranda* are not constitutionally mandated. In *Miranda*, the Court acknowledged that the warnings it created were not constitutionally required when it invited the Congress or the states to create alternatives[13] for protecting the Fifth Amendment guarantee:

---

silence on every subject": a person who cannot lawfully be coerced into speaking can, of course remain silent. [Confessions, Truth & the Law (Ann Arbor: The University Press, 1993), p 142.]

[13] The prosecutor has not offered an alternative to *Miranda* warnings—such as a videotaped confession—in this case, and we are not presented

> It is impossible for us to foresee the potential alternatives for protecting the privilege which might be devised by Congress or the States in the exercise of their creative rule-making capacities. Therefore we cannot say that the Constitution necessarily requires adherence to any particular solution for the inherent compulsions of the interrogation process as it is presently conducted. Our decision in no way creates a constitutional straightjacket which will handicap sound efforts at reform, nor is it intended to have this effect. [*Id.* at 467.]

Decisions by the Supreme Court after *Miranda* explicitly reinforce that "[t]he . . . *Miranda* warnings . . . are 'not themselves rights protected by the Constitution but [are] instead measures to insure that the [suspect's] right against compulsory self-incrimination [is] protected.' " *New York v Quarles*, 467 US 649, 654; 104 S Ct 2626; 81 L Ed 2d 550 (1984), quoting *Michigan v Tucker*, 417 US 433, 444; 94 S Ct 2357; 41 L Ed 2d 182 (1974). See also *Oregon v Elstad*, 470 US 298, 306; 105 S Ct 1285; 84 L Ed 2d 222 (1985); *Moran v Burbine*, 475 US 412, 426; 106 S Ct 1135; 89 L Ed 2d 410 (1986). Although a suspect who is questioned while in custody must be informed of the right to remain silent and the right to have an attorney present during interrogation, these rights are not created in the Fifth Amendment. Rather, the holding of *Miranda* is the doctrinal foundation of a claim that a confession is not admissible if it is a product of the inherent coercion the Court found present in custodial interrogation.

---

with the question whether such an alternative would fulfill the goals *Miranda* sought to fulfill.

III

To admit a confession in its case in chief, the state bears the burden of proving that the confession was voluntarily given by the defendant, thereby fulfilling the due process guarantee of the Fourteenth Amendment. *Connelly, supra.* In addition, if the confession was the result of custodial interrogation, the state must prove that the police properly informed the defendant of his *Miranda* rights and obtained a valid waiver.

The *Miranda* Court did not foreclose the possibility that, after the police administered the warnings and advice set forth in the opinion, a suspect might choose, for whatever reason, to forgo the benefits provided in the *Miranda* litany. The Court chose to apply the well-established standard for waiver of constitutional rights set forth in *Johnson v Zerbst,* 304 US 458, 464; 58 S Ct 1019; 82 L Ed 1461 (1938), to in-custody interrogation. In establishing a stringent waiver requirement, the Court determined that in order for the police to show that a suspect had elected to abandon the protections *Miranda* affords, there must be evidence of a voluntary, knowing, and intelligent waiver.[14] *Id.* at 444.

---

[14] Clearly, the Court must have been referring only to waiver of rights created by *Miranda* because it is nonsensical to talk about waiving one's Fifth Amendment right not to be compelled to testify.

The inquiry in a case where a confession is challenged as having been elicited in an unconstitutional manner is, therefore, whether the behavior of the police amounted to compulsion of the defendant. Because of the nature of the right to be free from compulsion, it would be pointless to ask whether a defendant knew of it before he made a statement; no sane person would knowingly relinquish a right to be free of compulsion. [*Schneckloth v Bustamonte,* 412 US 218, 280-281; 93 S Ct 2041; 36 L Ed 2d 854 (1973) (Marshall, J., dissenting).]

As noted in *Miranda,* clarified in *Moran, supra,* and reaffirmed in *Colorado v Spring,* 479 US 564, 573; 107 S Ct 851; 93 L Ed 2d 954 (1987), whether a "waiver is coerced 'has two distinct dimensions.' "

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived. [*Moran, supra* at 421.]

As explained more fully in *Moran,* a waiver is valid as a matter of law if the suspect's "decision not to rely on his rights was uncoerced, that he at all times knew he could stand mute and request a lawyer, and that he was aware of the State's intention to use his statements to secure a conviction." *Id.* at 422.

In *Edwards v Arizona,* 451 US 477, 478; 101 S Ct 1880; 68 L Ed 2d 378 (1981), the defendant was arrested on January 19, 1976, and read his *Miranda* rights. After being informed of his rights, the defendant stated that he understood his rights and wanted to make a statement. Midway through the questioning, however, the defendant invoked his right to counsel and questioning ceased. The next morning, the police returned to ask the defendant more questions and a guard at the jail told him "he had" to talk with the officers. The defendant was again advised of his *Miranda* rights, and he agreed to make a statement.

Before trial, the defendant moved to suppress his statement, contending that, after he had invoked his right to counsel, the police could not return to question him at a later time. The trial court refused to suppress the statement, concluding that the waiver was voluntary, and the defendant was convicted.

On appeal, the Arizona Supreme Court found a valid waiver solely on the basis that the waiver was voluntary. The United States Supreme Court rejected this analysis, concluding that the waiver also had to be knowing and intelligent under the "totality of the circumstances" and that the failure to establish that the waiver was knowing and intelligent rendered the Arizona Supreme Court's decision infirm.[15] *Id.* at 482-483.

In *Connelly, supra,* the Court addressed whether a confession caused by mental illness was an involuntary confession for purposes of the Fourteenth Amendment due process analysis. The Court concluded that, absent police coercion, a defendant's

---

[15] Specifically, the Court stated:

> It is reasonably clear under our cases that waivers of counsel must not only be voluntary, but must also constitute a knowing and intelligent relinquishment or abandonment of a known right or privilege, a matter which depends in each case "upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused."

>                    *       *       *

> Here, however sound the conclusion of the state courts as to the voluntariness of Edwards' admission may be, neither the trial court nor the Arizona Supreme Court undertook to focus on whether Edwards understood his right to counsel and intelligently and knowingly relinquished it. It is thus apparent that the decision below misunderstood the requirement for finding a valid waiver of the right to counsel, once invoked. [*Id.* at 482-484.]

mental state alone can never render a confession involuntary. *Id.* at 164.

The defendant in *Connelly* approached a Denver police officer and stated that he had murdered someone. The officer immediately informed the defendant of his *Miranda* rights, which the defendant stated he understood and wanted to waive. Another officer arrived on the scene and also informed the defendant of his rights; again, the defendant claimed to understand his rights, but still wanted to talk about the murder. The defendant then gave a detailed description of the murder to the police and pointed out where the murder had taken place. The defendant was placed in custody and held overnight. The following morning the defendant appeared visibly disoriented, gave confusing answers, and stated that "voices" had told him to come to Denver to confess. The defendant was sent to a state hospital, where he was found incompetent to stand trial for a period of time.

When the defendant regained competency and was scheduled for trial, defense counsel filed a motion to suppress the defendant's statement, alleging that the confession was involuntary because it was not the result of a free and rational choice. The trial court suppressed the confession, and the Colorado Supreme Court affirmed the trial court's decision. The prosecutor appealed to the United States Supreme Court, and the lower court decision was reversed. The Supreme Court concluded that the police had not engaged in any coercive behavior, that absent coercion a confession could not be involuntary, and that a deficiency in the defendant that is not exploited by

the police cannot vitiate the voluntariness of the confession. The Court stated:

> [W]hile mental condition is surely relevant to an individual's susceptibility to police coercion, mere examination of the confessant's state of mind can never conclude the due process inquiry. [*Id.* at 165.]

The focus in *Connelly* was solely on police action and how that related to any weakness in the defendant.

> Absent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law. [*Id.* at 164.]

*Connelly* clearly eliminated any subjective inquiry with regard to the voluntary prong of the waiver inquiry. Importantly, for purposes of the present inquiry, the Court also stated that the standard for determining whether a waiver is voluntary for *Miranda* purposes is the same standard for assessing whether a confession is voluntary under the Fourteenth Amendment due process inquiry.

> There is obviously no reason to require more in the way of a "voluntariness" inquiry in the *Miranda* waiver context than in the Fourteenth Amendment confession context. [*Id.* at 169-170.]

The prosecutor argues that the logic of examining police behavior and requiring more than a subjectively focused inquiry seems equally applicable to the knowing and intelligent prong of the *Miranda* inquiry. However, slightly more than one month after *Connelly*, the Supreme Court released *Spring*, and in dicta cited the test from *Moran*. Contrary to the

strong language the Court used in *Connelly* to establish that improper police behavior is necessary to render a confession involuntary, the test articulated in *Moran* and quoted in *Spring* appears to focus only on the knowledge of the accused irrespective of improper police behavior.

In some respects, it is questionable whether the focus of the Court in *Spring* was a subjective examination of the suspect's state of mind or whether, consistent with *Connelly*, police behavior must play some role in determining whether a suspect knowingly and intelligently waived the *Miranda* protections. After citing the language of *Moran*, the Court in *Spring* stated:

> The *Miranda* warnings ensure that a waiver of these rights is knowing and intelligent by requiring that the suspect be fully *advised* of this constitutional privilege including the critical advice that whatever he chooses to say may be used as evidence against him. [*Id.* at 574 (emphasis added).]

A reasonable interpretation of this language could lead to the conclusion that police need only inform a suspect of his rights in order for a subsequent waiver to be knowing and intelligent. Additionally, the entire discussion in *Spring* regarding whether the defendant made a knowing and intelligent waiver of his rights is dicta because the Supreme Court subsequently stated:

> In this case there is no allegation that Spring failed to understand the basic privilege guaranteed by the Fifth Amendment. Nor is there any allegation that he misunderstood the consequences of speaking freely to the law enforcement officials. [*Id.* at 575.]

However, given the incongruity between the clear language and logic of *Connelly* and the dicta in *Spring,* courts have been left to question whether the knowing and intelligent prong of the waiver analysis is a wholly subjective inquiry that focuses only on the suspect's post hoc claims regarding the warnings. On the basis of *Connelly,* the prosecutor argues that a wholly subjective inquiry into whether a waiver was knowing and intelligent, without reference to any misconduct on the part of the police, would fail for the same reason that police misconduct is necessary to establish that a waiver was not voluntary. If *Miranda*'s stated goal is to eliminate the inherently coercive nature of station-house interrogation, then there is no justification for excluding voluntary statements given during custodial interrogation after the police have apprised the defendant of his *Miranda* rights, and the defendant appears to understand those rights. Excluding otherwise validly obtained confessions on the basis that the defendant subjectively did not understand his rights, although there were no signs indicating any degree of confusion, creates the same problems the Court identified in *Connelly.*[16] Requiring courts to exclude a confession when the defendant later claims he misunderstood his rights would impose "a far-reaching requirement that courts must divine a defendant's motivation for speaking or

---

[16] If volunteered statements are not banned by *Miranda*—a concept explicitly adopted in *Miranda*—then there must be something about the presumptively coercive nature of police interrogation that triggers *Miranda* protections. Thus, it would seem logical to look to external, objective police behavior, and if the police behavior does not exploit an apparent weakness in the defendant that the police knew or should have known of, then there should be no *Miranda* violation justifying exclusion of the evidence.

acting as he did even though there be no claim that governmental conduct coerced his decision." *Connelly, supra* at 165-166. Moreover, the focus on police behavior conforms with the goal of a prophylactic exclusionary rule:

> The deterrent purpose of the exclusionary rule necessarily assumes that the police have engaged in willful, or at the very least negligent, conduct which has deprived the defendant of some right. By refusing to admit evidence gained as a result of such conduct, the courts hope to instill in those particular investigating officers, or in their future counterparts, a greater degree of care toward the rights of an accused. Where the official action was pursued in complete good faith, however, the deterrence rationale loses much of its force. [*Michigan v Tucker, supra* at 447.]

The prosecutor argued that, as in *Connelly*, suppressing defendant's statements in this case would serve no deterrent "purpose in enforcing constitutional guarantees." *Connelly, supra* at 166.

*Miranda*, if nothing else, has the "virtue of informing police and prosecutors with specificity . . . what they may do in conducting custodial interrogation, and of informing courts under what circumstances statements obtained during such interrogation are admissible." *Fare v Michael C*, 442 US 707, 718; 99 S Ct 2560; 61 L Ed 2d 197 (1979). This virtue is lost when confessions are suppressed in situations where the police properly administer the warnings required by *Miranda* and by all external indications obtain a valid waiver. The United States Supreme Court has recognized that in certain situations, the benefits afforded by *Miranda* are outweighed by the detrimental consequences of excluding evidence obtained in violation of those protections. *New York v Quarles*

(public safety exception). Excluding confessions where all objective indications illustrate that the defendant understands the warnings and elects to waive them would seem to be one of those situations. If the police inform the defendant of his *Miranda* rights, and there is no evidence that the police knew or should have known that the defendant did not comprehend those rights, the rationale of *Miranda* would seem to dictate that any statements voluntarily made after that point should be admissible.[17] In these circumstances, suppressing a confession serves no purpose. There is nothing more the police could do, nor is there any objectionable police behavior.[18]

A

Suppressing an otherwise valid confession on the basis of the defendant's belated contention that he really did not understand the rights he was forgoing forces the Court to make "sweeping inquiries into the state of mind of a criminal defendant who has con-

---

[17] The waiver standard is more stringent after the defendant states he would like to see an attorney.

[T]he Court has strongly indicated that additional safeguards are necessary when the accused asks for counsel; and we now hold that when an accused has invoked his right to have an attorney present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. [*Edwards v Arizona, supra* at 484.]

This issue is not presented in this case, however, because defendant did not request counsel.

[18] Of course, a defendant's level of cognitive understanding is a factor in the objective inquiry of police behavior. A confession is validly suppressed where the police exploit an apparent mental deficiency in the defendant, or where a defendant's level of cognitive understanding is so low that the police knew or should have known that the person is not capable of understanding.

fessed, inquiries quite divorced from any coercion brought to bear on the defendant by the State."[19] *Connelly, supra* at 167. However, we are not persuaded that the Supreme Court has clearly foreclosed that inquiry.

The federal circuits that have acknowledged the conflict between the language in *Spring* and the logic of *Connelly* have uniformly concluded that, although perhaps inconsistent, the knowing and voluntary prong of the waiver inquiry seems to ignore police action and focus solely on the suspect's understanding. See *United States v Bradshaw*, 290 US App DC 129, 133; 935 F2d 295 (1991); *Derrick v Peterson*, 924 F2d 813 (CA 9, 1990); *Miller v Dugger*, 838 F2d 1530 (CA 11, 1988).

In *Derrick v Peterson*, Derrick, a sixteen year old, was taken into custody as a suspect in the murder of his parents. After the police informed Derrick of his *Miranda* rights, he stated "that he understood his rights, that he had been advised of them numerous times . . . and was quite well aware of what that procedure was and his right to counsel." *Id.* at 816. After waiving his rights, Derrick proceeded to confess to murdering his parents.

Before trial, Derrick's counsel filed a motion to suppress his confession. At the suppression hearing, two psychologists testified that Derrick had an IQ between

---

[19] Competency to stand trial is not equivalent to competency to waive *Miranda* warnings because there is a different focus in each inquiry. To waive *Miranda* warnings, there must be a voluntary relinquishment of a known right or privilege. In assessing whether a defendant is competent to stand trial, the focus is on the defendant's ability to aid in his defense. The latter inquiry presumes there is counsel appointed or retained to aid the defendant in his defense. This explains why there is a higher standard for waiver of Sixth Amendment rights.

sixty-two and seventy-four, and that, while Derrick probably could understand the words of the warning, there was serious doubt regarding whether he could understand the ramifications of giving a statement. Both psychologists also stated that defendant's previous arrests made a "substantial difference" in Derrick's ability to understand his rights. *Id.* The trial judge, who presided at the hearing, concluded that Derrick's statement was voluntary and that he knew what his rights were. Derrick was tried, and a jury subsequently convicted him of first-degree manslaughter and murder.

On appeal, Derrick again raised the admissibility of his confession, contending both that his waiver was involuntary and that it was not knowingly and intelligently made. The United States Court of Appeals for the Ninth Circuit first concluded that there was no police coercion involved and that the defendant's statement was voluntary. In addressing Derrick's claim that his waiver was not knowing and voluntary, the court examined the United States Supreme Court's decision in *Connelly* and stated:

> While *Connelly* clearly holds that the "voluntariness" inquiry in the *Miranda* waiver context is equivalent to the voluntariness inquiry under the fourteenth amendment, it is not as clear whether an inspection of the "knowing" and "intelligent" prong of the *Miranda* waiver analysis is likewise rendered unnecessary by a conclusion that a confession is voluntary under the fourteenth amendment. [924 F2d 820.]

After noting the Supreme Court's citation in *Spring* of the waiver standard articulated in *Moran*, the court concluded that, "although a determination of voluntariness under the fourteenth amendment forecloses a

similar inquiry in the *Miranda* waiver context, we must conduct a separate review of whether Derrick knowingly and intelligently waived his *Miranda* rights." *Id.* The *Derrick* court readily acknowledged, however, that such a result "as a matter of logic" is unsatisfactory. *Id.* The court observed that if examination of the confessant's mind alone never can establish a due process violation, it is anomalous that a waiver of *Miranda* rights can be invalidated solely on the basis of the confessant's claim that he did not understand these warnings. The court found such a reading illogical in that impermissible state action is required pursuant to the voluntary prong, but is apparently irrelevant with respect to the knowing and intelligent prong.[20]

The court eventually concluded, however, that until the United States Supreme Court eliminates this tension, the bifurcated inquiry must continue. After examining the defendant's mental abilities and the facts surrounding the confession, the court held that Derrick knowingly and intelligently waived his rights.

Similarly, in *Bradshaw, supra,* the defendant robbed a bank and was arrested a few blocks away when a red dye packet that was included in the sack with the money exploded. After the police took the defendant into custody, he was properly informed, both in writing and orally, of his *Miranda* rights.

---

[20] As explained by the court in *Derrick*:

Thus, [the United States Supreme Court] requires that there be improper state action under the fourteenth amendment before a confession can be suppressed, but requires no such state action in the *Miranda* context, even though the constitutional provision underlying the *Miranda* warning—the fifth amendment—is applied to the states through that same fourteenth amendment. [*Id.* at 821.]

After asking a few questions about his rights, the defendant stated that he understood the rights *Miranda* afforded him and he signed the waiver form. He then gave a statement admitting that he had robbed the bank.

Before trial, the defendant moved to suppress his confession, arguing that his history of mental illness and intoxication at the time of his arrest made it impossible for him to knowingly and intelligently waive his rights. The trial court concluded that a waiver is only invalid if there is some form of police coercion. Finding no coercion, the confession was not suppressed.

At trial, the defendant was convicted as charged. On appeal, he continued to argue that his confession was invalid because he did not have the mental capacity to knowingly and intelligently waive his rights.

The United States Court of Appeals for the District of Columbia extensively reviewed the United States Supreme Court's opinion in *Connelly* and noted the following:

> To be sure, some of the reasoning in the section of *Connelly* dealing with the due process voluntariness standard could be applicable to our case as well. The Court, for example, observed that evidence should not be excluded unless suppression would deter future constitutional violations, see [479 US 166]. Since the police may not know whether an individual does not or cannot understand *Miranda* warnings (the government claims here that the police were not aware of Bradshaw's illness), an argument could be made that in those circumstances, deterrence is inapposite. [*Bradshaw, supra* at 133.]

After identifying the potential applicability of the logic in *Connelly*, however, the *Bradshaw* court concluded that the language in *Spring*, reiterating that a waiver must be both voluntary and knowing, prohibited extending the *Connelly* analysis to the knowing and intelligent prong of the waiver inquiry. Thus, the court concluded that to be valid, a waiver must be voluntary and knowing and intelligent. Because the trial court had not made any findings regarding whether the defendant understood his rights, the case was remanded to the trial court to make that determination.

On the basis of the United States Supreme Court's opinion in *Spring*, the federal circuit courts have unanimously rejected the prosecutor's position that *Connelly* limited the entire waiver analysis—both the voluntary and knowing and intelligent prongs—to a wholly objective inquiry that focuses only on police behavior. The Court's opinion in *Spring* seems to assume, with no reference to *Connelly*, that the focus of the knowing and intelligent prong of the waiver analysis rests solely on the suspect's understanding. Thus, like the federal circuit courts that have examined this question after *Connelly*, we too must conclude that, until the United States Supreme Court clarifies the apparent inconsistency between the voluntary and knowing and intelligent prongs of the waiver analysis, a subjective inquiry into the suspect's level of understanding is required and must be assessed under the "totality of the circumstances," irrespective of police behavior.

IV

Proceeding on the premise that a "knowing and intelligent" waiver is required in situations where the confession is wholly voluntary, and there is no evidence of impermissible police conduct, we agree with the trial judge that defendant sufficiently understood his rights and that he could and did provide a valid waiver.

A

Whether a suspect has validly waived his *Miranda* rights depends in each case on the totality of the circumstances surrounding the interrogation. *North Carolina v Butler*, 441 US 369; 99 S Ct 1755; 60 L Ed 2d 286 (1979); *Fare, supra* at 725. The totality of the circumstances approach

> permits—indeed, it mandates—inquiry into all the circumstances surrounding the interrogation. This includes evaluation of the [suspect's] age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights. [*Id.*]

The burden is on the state to prove by a preponderance of the evidence that the suspect properly waived his rights. *Connelly, supra* at 168.

Defendant does not contend that his confession was involuntary, and his testimony at the suppression hearing clearly indicates a lack of coercion surrounding his confession. At the hearing, defendant stated that he wanted to tell the police what happened and that he did tell them.[21] Defense counsel further

---

[21] The questioning was as follows:

reinforced that he was "not claiming that it was an involuntary statement."

Given that defendant's confession was voluntary, the critical inquiry in this case is the degree of understanding the accused must possess in order to provide a knowing and intelligent waiver of the rights *Miranda* affords. To knowingly waive *Miranda* rights, a suspect need not understand the ramifications and consequences of choosing to waive or exercise the rights that the police have properly explained to him.

> [*Miranda*] requires that the accused be advised of his rights so that he may make a rational decision, not necessarily the best one or one that would be reached only after long and painstaking deliberation. Indeed, it may be argued forcefully that a choice by a defendant to forego the presence of counsel at a police interrogation is almost invariably an unintelligent course of action. It is not in the sense of shrewdness that *Miranda* speaks of "intelligent" waiver but rather in the tenor that the individual must know of his available options before deciding what he thinks best suits his particular situation. [*Collins v Brierly*, 492 F2d 735, 738-739 (CA 3, 1974).]

---

*Q.* [*Mr. Letho*]: And you actually did tell him a whole lot of stuff?

*A.* [*Mr. Cheatham*]: I told him what happened.

*Q.* Told him what happened?

*A.* Yes.

*Q.* And you wanted to tell him what happened at that time?

*A.* Yes.

\*        \*        \*

*Q.* Okay. At that time like you say, you wanted to tell the police what happened, right?

*A.* Yes.

Lack of foresight is insufficient to render an otherwise proper waiver invalid. See *Spring, supra* at 574; *Elstad, supra* at 316.

> [T]he test is not whether [the defendant] made an intelligent decision in the sense that it was wise or smart to admit his participation in the crime, but whether his decision was made with the full understanding that he need say nothing at all and that he might then consult with a lawyer if he so desired. [*United States v Hall*, 396 F2d 841, 846 (CA 4, 1968).]

To establish a valid waiver, the state must present evidence sufficient to demonstrate that the accused understood that he did not have to speak, that he had the right to the presence of counsel, and that the state could use what he said in a later trial against him. *Moran, supra* at 423. "That is the meaning of intelligent waiver; that and no more." *Harris v Riddle*, 551 F2d 936, 939 (CA 4, 1977).[22]

B

An appellate court must give deference to the trial court's findings at a suppression hearing. *People v*

---

[22] Although we would add that a defendant must also comprehend that he has the right to the presence of counsel, the following statement from *United States v Yunis*, 273 US App DC 290, 301-302; 859 F2d 953 (1988), is helpful in explaining comprehension and the ability to give a valid waiver:

> We conclude that, as the *Miranda* decision itself suggests, the focus must be on the plain meaning of the required warnings. A defendant must comprehend, for example, that he really does not have to speak; he must recognize that anything he says actually will be used by the state against him. But whether he fully appreciates the beneficial impact on his defense that silence may have— whether he fully understands the tactical advantage, in our system of justice, of not speaking—does not affect the validity of his waiver.

*Burrell*, 417 Mich 439, 448; 339 NW2d 403 (1983). Although engaging in de novo review of the entire record, see *People v Walker (On Rehearing)*, 374 Mich 331, 338; 132 NW2d 87 (1965), this Court will not disturb a trial court's factual findings regarding a knowing and intelligent waiver of *Miranda* rights "unless that ruling is found to be clearly erroneous."[23] *Burrell, supra* at 448. Credibility is crucial in determining a defendant's level of comprehension, and the trial judge is in the best position to make this assessment. After a thorough and independent review of the record, we conclude that the trial judge correctly determined that defendant knowingly and intelligently waived his rights.

C

Defendant's expert witness testified that defendant knew he did not have to talk and could remain silent, the first element of a knowing and intelligent waiver of *Miranda* rights under *Moran*. The trial court clearly disbelieved defendant's testimony and the record supports that conclusion. It is undisputed that the police officers who questioned defendant administered the required warnings, sought to insure that he understood each warning by inquiring after each warning whether he understood what the warning meant, and obtained an express written waiver before questioning him.

---

[23] As the United States Court of Appeals for the Seventh Circuit has so graphically explained, "To be clearly erroneous, a decision must strike us as more than just maybe or probably wrong; it must . . . strike us as wrong with the force of a five-week old, unrefrigerated dead fish." *Parts & Electric Motors, Inc v Sterling Electric, Inc*, 866 F2d 228, 233 (CA 7, 1988).

Defendant was informed of his *Miranda* rights at least twice. Because he indicated that he could not read, a second officer was brought into the room to verify that the first officer read each of the rights to defendant. After each right, defendant was asked whether he understood that particular right and answered that he did. He was then asked to place his initials in front of that right, which he did. An officer testified that defendant did not ask any questions about any rights, nor did the officers have any trouble communicating with him. As noted in *Derrick*, "[the] written waiver in particular is strong evidence that the waiver was valid." *Id.* at 824. Defendant provided appropriate answers in response to the officer's questions, and "[t]here is no evidence that, at the time the warnings were given and during the subsequent questioning, Defendant manifested expressly or by implication from [his] words and actions any lack of comprehension of what was said to [him] or of what was occurring." *United States v Marenghi*, 896 F Supp 207, 219 (D Me, 1995).

The psychologist who testified for defendant both at the suppression hearing and at trial, Dr. Steven Miller, concluded that defendant knew he did not have to talk and could be quiet.[24] Defendant, however,

---

[24] At the suppression hearing, Dr. Miller was questioned by the prosecutor, Mr. Letho:

*Q.* Now anyways, based on your conclusion, you state as to his understanding of his Constitutional Rights, he did seem to comprehend and not to say anything to the officers. However, beyond that, it is doubtful he could appreciate the scope of the intent of the rights to protect him from potentially incriminating himself. So in other words, he knew that he had a right not to talk, right?

*A.* When I asked him what that meant, he said that you don't have to say anything. You can be quiet.

professed that he did not remember being advised of his rights and that he only understood that he did not have to talk to the police after Dr. Miller explained that to him. On cross-examination the prosecutor asked defendant if he knew "what it means when somebody tells you that you do not have to answer any questions put to you?" Defendant first answered "no," but when questioned further, stated that he knew the prosecutor was currently questioning him and that he "might know" what a question is.[25] When asked whether he knew what an attorney was from watching television, defendant answered that he only watched "TV now and then," and that, although he had seen "shows where they had court on television," he did not know which persons on those shows were attorneys.[26] Considered in its entirety, the record clearly indicates that defendant was able to engage in

---

[25] *Q.* [*Mr. Letho*]: You know what it means when somebody tells you that you do not have to answer any questions put to you?

    *A.* [*Defendant*]: No.

    *Q.* Am I asking you questions right now?

    *A.* Yeah.

    *Q.* So you know what a question is?

    *A.* A question is when somebody is talking to you. I might know what it is.

    *Q.* Pardon me?

    *A.* I might know what it is, that someone talks to me.

    *Q.* In other words, you know what a question is, when I ask you [a] question like I am now and you can give an answer?

    *A.* Yeah, I might.

                 *       *       *

    *Q.* Then if somebody tells you any statement you make or anything you say can be used against you in the court, you can understand that, can't you.

    *A.* A little bit.

[26] *Q.* [*Mr. Letho*]: What does the attorney do?

    *A.* [*Defendant*]: Try the case for somebody.

a calculated attempt to testify about what he thought would benefit him at the suppression hearing: that he told the officers he could not read; that he could not remember whether he had been advised of his rights, both on this occasion and at the time of his previous arrest; and to deny that he understood any of the rights that were read to him. The waiver form indicates that defendant provided appropriate background information, including names and addresses of family members, phone numbers, date of birth, height, and weight. Finally, defendant answered in excess of one hundred questions put to him by his counsel and the prosecutor at the suppression hearing without ever indicating that he did not understand what was being asked.[27] Despite the fact that Dr.

---

*Q.* You knew that from watching TV and going to school, didn't you?

*A.* No, I just watch TV now and then.

*Q.* You saw shows where they had court on television, didn't you?

*A.* Yeah.

*Q.* And when you watched those kind of shows, you knew which people were attorney's, didn't you?

*A.* No.

[27] Although the Court of Appeals found that defendant's answers were "unresponsive," the evidence it cited were three answers to questions on cross-examination by the prosecutor. Viewed in context, these responses actually demonstrate that defendant understood the position he had taken in his statements, the claim he was making at the suppression hearing, and that he had the intellectual acumen to try to evade answers that would undermine those claims. Thus, when the prosecutor sought to impeach his claim that he did not know what an attorney was by suggesting that he knew it from watching TV, defendant answered, "No, I just watch TV now and then." When the prosecutor sought to establish that defendant knew he did not have to tell the police officers anything, defendant claimed he only knew that "[a]fter the doctor came and talked to me." Finally, defendant's answer to the question about the name of the person in the car with him is evidence that he was able to understand that, if he admitted on cross-examination that he knew the name of the codefendant, he would undermine the position he took in both statements

Miller testified that he believed defendant was not competent to waive his *Miranda* rights,[28] "[w]aiver and defendant's competence to waive rights are legal, not psychological, concepts, and the judge, not an expert witness, is the ultimate decision maker on these issues." *State v Cleary*, 161 Vt 403, 406; 641 A2d 102 (1994).

Although defendant claims not to have known what an attorney was, he knew he had a right to have a lawyer present. Pursuant to *Oregon v Elstad, supra*, a defendant need not know what services an attorney can provide, but merely that he has a right to the presence of a lawyer before making a statement. The purpose of appointing counsel is not to insure that the defendant's choice regarding waiver is wise, but to help dissipate coercion the United States Supreme Court has found present in custodial interrogation. See Grano, Confessions, Truth & the Law (Ann Arbor: The University Press, 1993), p 170.

The record also indicates that defendant knew the police intended to use his statement against him, the third element of a knowing and intelligent waiver under *Moran*. First, defendant had been arrested previously for carrying a concealed weapon, a fact he chose not to tell the police in his first statement and

---

that he merely accepted a ride from a comparative stranger. These responses support the conclusion that defendant had the cognitive ability to tailor his answers to what he perceived to be his own best interests. The responses may not have been sophisticated, but they were not unresponsive.

[28] Defense counsel Jeffrey Collins also questioned Dr. Miller:

Q. So in conclusion, your opinion was that he was not competent to waive his *Miranda* rights?
A. Yes.

that he never told Dr. Miller during their discussion.[29] Second, he knew enough to dispose of his gun immediately after the car accident. Third, he deliberately chose not to tell the police that he had thrown the gun in the alley before his arrest because he did not want to go back to jail. This behavior illustrates that defendant knew the police could use any information he provided to his detriment and further supports the trial court's disbelief of defendant's testimony. His actions also indicate he had learned from his previous interaction with the police. As noted by the North Carolina Supreme Court, a defendant's previous experience with the police is "an important consideration in determining whether an inculpatory statement was made voluntarily and understandingly." *State v Fincher*, 309 NC 1, 20; 305 SE2d 685 (1983). Although other courts have found that past interaction with the police, in and of itself, may have little bearing on the validity of a waiver,[30] if a defendant deliberately tailors his response to earlier actions with the police, there is sufficient evidence to conclude that the defendant understood his relationship with the police. It is not necessary for a defendant to know how the police could use his statement, simply that what he told them might help place him in jail.

D

Dr. Miller's evaluation indicated defendant had an IQ of sixty-two, which placed him at the low end of

---

[29] Q. [*Mr. Collins*]: Were you aware of any juvenile criminal history?
A. [*Dr. Miller*]: Mr. Cheatham denied any previous arrest record for juvenile or adult.

[30] See *Smith v Zant*, 855 F2d 712, 718 (CA 11, 1988).

mild mental retardation.[31] A defendant's IQ, however, is only one factor in the "totality of circumstances" a court must consider in assessing whether a defendant has the requisite level of comprehension.[32] Low mental ability in and of itself is insufficient to establish that a defendant did not understand his rights. See *Dunkins v Thigpen*, 854 F2d 394, 399-400 (CA 11, 1988); *Cleary, supra*. "[N]o single factor, such as IQ, is necessarily determinative in deciding whether a person was capable of knowingly and intelligently waiving . . . the constitutional rights embraced in the *Miranda* rubric." *Fairchild v Lockhart*, 744 F Supp 1429, 1453 (ED Ark, 1989).

An individual's IQ score is not dispositive in deciding whether an individual is mentally retarded, but only one element of a three-part inquiry. The generally accepted test for determining mental retardation is stated in the *Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV):

---

[31] *Q. [Mr. Collins]*: Did you perform any other psychological testing?

*A. [Dr. Miller]*: Yes. As I said, I gave him the full scale intelligence testing and verbal skills. He achieved a percentile of one percent, which means 99 percent of all those age groups scored better on that test than he did, and so he was in the lowest one percentile, and his score was 63, which is a score for mildly retarded. His performance score was one percentile, also 63, and it also indicated mild retardation, and the full scale score was 62. This was at the lower end of mild mentally [sic] retardation. It starts at 60 and goes to 69, and he was at 62.

[32] Courts have upheld waivers in cases in which the defendant's IQ is as low as fifty-one, *Grayson v State*, 438 SW2d 553 (Tex Crim App, 1969), and fifty-seven, *Twymon v State*, 358 So 2d 1072 (Ala Crim App, 1978), but other courts have excluded confessions in cases in which the defendant's IQ is as high as seventy-four. *Commonwealth v Reynolds*, 300 Pa Super 143; 446 A2d 270 (1982).

> The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety (Criterion B). The onset must occur before age 18 years (Criterion C). [*Diagnostic and Statistical Manual of Mental Disorders* (4th ed) (Washington, DC: American Psychiatric Ass'n, 1994), p 39.]

The first two criteria require further explanation.[33] An individual who has an IQ of less than seventy is typically classified as having significantly subaverage intellectual functioning. *Id.* Alluring as it is to grasp onto a quantifiable value when assessing a concept as amorphous as intelligence, and assuming that intelligence can be quantifiably measured, it is important to note that an IQ of seventy represents only a ninety-five percent certainty that an individual's IQ falls between sixty-five and seventy-five.[34] *Id.* An individual's IQ should not be viewed as an exact number, but rather, as "one value within a probable band of IQs." Grossman, *Classification in Mental Retardation* (Washington, DC: American Association on Mental Deficiency, 1983), p 24. Moreover, unlike interval scales involving equal units where the distance between each point on the scale is the same—the difference between five and ten is equal to the difference between ten and fifteen—the same cannot be

---

[33] Although the record does not definitively establish that the onset of defendant's condition occurred before age eighteen, we will assume that it did, given defendant's placement in special education classes throughout his schooling.

[34] The ninety-five percent confidence interval coincides with Dr. Miller's report that indicates defendant's IQ is between fifty-eight and sixty-eight.

said for IQ values. Clarke, Clarke & Berg, *Mental Deficiency: The changing outlook*, 4th ed (New York: The Free Press, 1985), p 61. An individual with an IQ of 100 is not twice as smart as an individual with an IQ of fifty. The most that can be said is that the individual with an IQ of 100 performed better on the test than did the individual with an IQ of fifty.

> The fact that IQs are expressed as numbers increasing by 1 (110, 111, 112, etc.) or that the average IQ of a group is 97.56 gives the IQ an aura of precision it does not merit. [*Id.*]

Emphasis by courts solely on IQ in determining competency reinforces the misperception that there is one psychometric definition of intelligence that can be quantified in a single numeric figure.

> In large part, legal treatment of retarded defendants has been distorted by the law's ignorance of exactly what mental retardation means. Virtually all cases dealing with this subject have simply recited a defendant's IQ, noted that it was below normal, and then stated that simply because the defendant might be stupider than the average person does not mean that he is incompetent.
>
> These courts have adopted the common fallacy that mental retardation is defined by IQ scores. Actually, IQ is no more than a convenient numerical scale used to categorize degrees of mental aptitude. While certain categories at the lower end of the IQ scale have been assigned the classification of "retarded," the scores themselves say little about a person's skills and aptitudes. [Mickenberg, *Competency to stand trial and the mentally retarded defendant: The need for a multi-disciplinary solution to a multi-disciplinary problem*, 17 Cal W L R 365, 390 (1981).]

By definition, an IQ below seventy alone is not sufficient to establish that an individual is mentally

retarded.[35] An individual must "show significant defi-
cit in *both* measured intelligence and adaptive behav-
ior . . . ." Grossman, *supra* at 207. In the *Diagnostic
and Statistical Manual of Mental Disorders* (*DSM-IV*),
the American Psychiatric Association notes: "Mental
Retardation would not be diagnosed in an individual
with an IQ lower than 70 if there are no significant
deficits or impairments in adaptive functioning." *Id.*
at 40. Adaptive functioning

> refers to how effectively individuals cope with common life
> demands and how well they meet the standards of personal
> independence expected of someone in their particular age
> group, sociocultural background, and community setting.
> [*Id.*]

Typically, impairments in adaptive functioning are the
only outwardly noticeable indicia that an individual
may be mentally retarded, not a low IQ. *Id.*

The record in this case does not indicate that
defendant presents any impairment in adaptive func-
tioning that would indicate defendant may be men-
tally retarded. First, his answers to the questions initi-
ated by the police were responsive and appropriate.
Second, Dr. Miller made the following observations in
his report:

> Grooming and hygiene were good. Facial expressions
> were normal and he spoke in a logical and coherent man-

---

[35] As noted by Clarke, Clarke & Berg, *supra* at 69:

"Mental retardation" (like its progenitor, intelligence) is a general
concept difficult to define precisely. It cannot be defined by IQ
alone because low IQs can be a consequence of a particular test,
the tester, the circumstances of testing and characteristics of the
individual other than low intelligence (e.g. language handicap) act-
ing alone or interacting to produce the low score.

ner. Mood and affect were appropriate and congruent with
the circumstances of the interview albeit constricted with
indications of depression. He was oriented to person, place
and personal relationship to reality.

Aside from a somewhat below average IQ, the record
does not indicate defendant presented any impair-
ments in adaptive functioning.

Once an individual is determined to have some
level of mental retardation—i.e., an IQ below seventy,
significant limitations in adaptive functioning in at
least two areas, and onset before age eighteen—the
degree of mental retardation is further defined.
Depending on the level of mental impairment, the
individual is classified as either mildly, moderately,
severely, or profoundly retarded. *DSM-IV*, supra at 40.
The following chart illustrates the generally accepted
classification.

| | |
|---|---|
| Mild Mental Retardation: | IQ level 50-55 to approxi-mately 70 |
| Moderate Retardation: | IQ level 35-40 to 50-55 |
| Severe Mental Retardation: | IQ level 20-25 to 35-40 |
| Profound Mental Retardation: | IQ level below 20-25 |
| [*DSM-IV, supra* at 40.] | |

Assuming, arguendo, that defendant is mentally
retarded to some degree, he would most likely be
classified as mildly retarded.[36] But like an IQ value of
sixty-two, labeling someone as mildly retarded does
not aid in understanding the skills and abilities of
someone who falls within that category.[37] Additional

---

[36] Dr. Miller's report reinforces this classification.

[37] Dr. Miller's assessment that defendant's test scores place him in the
lowest one percentile of all persons of his age who take the test is not
illuminating. "The prevalence rate of Mental Retardation has been esti-
mated at approximately 1%." *DSM-IV*, p 44. Therefore, Dr. Miller's com-

information about the attributes associated with individuals labeled as mildly retarded is necessary.

The *DSM-IV* provides the following explanation regarding the skills and characteristics generally associated with individuals who fall within the mild mental retardation category:

> Mild Mental Retardation is roughly equivalent to what used to be referred to as the educational category of "educable." This group constitutes the largest segment (about 85%) of those with the disorder [mental retardation]. . . . During their adult years, they usually achieve social and vocational skills adequate for minimum self-support, but may need supervision, guidance, and assistance, especially when under unusual social or economic stress. With appropriate supports, individuals with Mild Mental Retardation can usually live successfully in the community, either independently or in supervised settings. [*Id.* at 41.]

The American Association on Mental Deficiency expands and applies the explanation set forth in the *DSM-IV*, by providing the following examples of everyday activities mildly retarded individuals can accomplish:

> *Independent functioning*: Exercises care for personal grooming, feeding, bathing, toilet; may need health or personal care reminders; may need help in selection or purchase of clothing.
>
> *Physical*: Goes about hometown (local neighborhood in city, campus at residential center) with ease, but cannot go to other towns alone without aid; can use bicycle, skis, ice skates, trampoline, or other equipment requiring good coordination.

---

ment only indicates that the test scores illustrate defendant is mentally retarded to some degree.

*Communication:* Communicates complex verbal concepts and understands them; carries on everyday conversation, but cannot discuss abstract or philosophical concepts; uses telephone and communicates in writing for simple letter writing or orders but does not write about abstractions or important current events.

*Social:* Interacts cooperatively or competitively with others and initiates some group activities, primarily for social or recreational purposes; may belong to a local recreation group or church group, but not to civic organizations or groups of skilled persons (e.g., photography club, great books club); enjoys recreation (e.g., bowling, dancing, TV, checkers) but either does not enjoy or is not competent at activities (e.g., chess, bridge, tennis) or hobbies requiring rapid, involved or complex planning and implementation.

*Economic activity:* Can be sent or go to several shops (without a note to shopkeepers) to purchase several items; can make change correctly, but may not use banking facilities; may earn living but has difficulty handling money without guidance.

*Occupation:* Prepares simple meals; performs everyday household tasks (cleaning, dusting, dishes, laundry); as an adult can engage in semiskilled or simple skilled job not requiring complex thinking or judgment.

*Self-direction:* Initiates most of own activities; is conscientious about work and assumes much responsibility but needs guidance on jobs requiring responsibility for important decisions (health care, care of others, complicated occupational activity). [Grossman, *supra* at 207-208.]

Clearly, the mentally retarded population is as heterogeneous as the nonmentally retarded and blanket statements regarding this group of persons are no more appropriate than any stereotype. In determining whether to suppress a confession, a trial judge should examine all available and relevant information including the aforementioned criteria.

E

Conceding that there is a level of mental deficiency so severe that under no circumstances would a defendant be able to knowingly waive his rights, we observe that short of this level of incapacity, a defendant's mental ability of necessity must be only one factor in the "totality of circumstances" inquiry. To hold otherwise would effectively immunize the mentally limited from interrogation and preclude the socially beneficial use of confessions,[38] despite the absence of any indication of overreaching by the police. Creating a lower threshold for a knowing and intelligent waiver than that which we have articulated today would preclude a defendant who has sufficient mental ability to participate in a crime, dispose of evidence, be tried for the crime, elect to testify at trial, and face potential life incarceration, from taking responsibility for his actions by giving a statement to the police explaining what happened.

V

At the end of the suppression hearing, the trial judge concluded that there is no issue of coercion regarding defendant's statement, that defendant wanted to tell the police what happened, and that he sufficiently understood his rights.

> There is no issue of voluntariness at all. The only question is whether he understood the rights. I notice in the questioning here of the defendant, the defendant was, in my opinion, making himself look a little more helpless than what he might be. For example, yes, I understood the questions, and then he added a little bit when asked if he

---

[38] *Moran, supra* at 426.

could—he was asked the question about his educational background. He understood that term, and had no difficulty answering when ask[ed] by the attorneys. He indicated his rights were given to him twice by two different people, and they were read to him, and in my opinion, even though he is intellectually limited and cannot read, I think he understood his rights adequately.

The conclusions reached are not clearly erroneous. Thus, we would reverse the opinion of the Court of Appeals and would remand for further proceedings consistent with this opinion.

BRICKLEY, C.J., and RILEY, J., concurred with BOYLE, J.

WEAVER, J. I concur in all but part III of the lead opinion.

CAVANAGH, J. (*concurring in part*). On the basis of the evidence in the record presented to this Court, I agree with the result reached in regard to the only issue actually before us: whether defendant's waiver of his Fifth Amendment rights was "knowing and intelligent" and therefore valid. More specifically, I agree with my brother MALLETT's statement that "[t]he trial court did not clearly err in finding that Mr. Cheatham did in fact understand that he could keep silent, that if he did say anything the state could use whatever he said as evidence against him, and that he could have an attorney to represent him." *Post*, p 58. In fact, I join in the entirety of Justice MALLETT's opinion, but still must write separately to distance myself from the lead opinion's unnecessary discussion and decision of issues not actually presented in this appeal.

I

A

The lead opinion notes that "[d]efendant claims that his waiver was not knowing and intelligent under both the Fifth Amendment of the United States Constitution and art 1, § 17 of the Michigan Constitution, but does not provide any reason or analysis for a different construction [of art 1, § 17]." *Ante*, p 10, n 11. Accordingly, the lead opinion's assertions that "there is no need in this case to construe the protection against self-incrimination found in the Michigan Constitution differently from the identical federal guarantee," and that "[o]n the facts of this case, if defendant's Fifth Amendment right to be free from compelled self-incrimination was not violated, neither was a corresponding right under art 1, § 17 of the Michigan Constitution," *ante*, p 10, are mere dicta and have no precedential authority for future cases. See *Goolsby v Detroit*, 419 Mich 651, 655, n 1; 358 NW2d 856 (1984).

Furthermore, the lead opinion's attempt to immutably link our interpretation of the Michigan Constitution to the United States Supreme Court's interpretation of analogous provisions of the federal constitution is, as a general rule, wholly unsupported by our case law. See *People v Bender* and *Ziegler*, 452 Mich 594, 613, n 17; 551 NW2d 71 (1996).

B

Also unnecessary to the analysis of this case is the lead opinion's discussion of the voluntariness prong of a *Miranda* waiver analysis. The lead opinion concedes, as it must, that "[t]here is no dispute that the waiver was voluntary," *ante*, p 5, but then includes a

tendentious survey of cases involving the voluntariness prong, ultimately conflating this prong with the "knowing and intelligent" prong.

The lead opinion acknowledges that "[a]s noted in *Miranda* [*v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966)], clarified in *Moran* [*v Burbine*, 475 US 412; 106 S Ct 1135; 89 L Ed 2d 410 (1986)], and reaffirmed in *Colorado v Spring*, 479 US 564, 573; 107 S Ct 851; 93 L Ed 2d 954 (1987), whether a 'waiver is coerced "has two distinct dimensions." ' " *Ante*, p 14. Then, however, this "reaffirm[ation]" is, according to the author of the lead opinion, magically transformed into dicta because the United States Supreme Court in *Spring* ultimately held that

> "[i]n this case there is no allegation that Spring failed to understand the basic privilege guaranteed by the Fifth Amendment. Nor is there any allegation that he misunderstood the consequences of speaking freely to the law enforcement officials." [*Ante*, p 18, quoting *Spring*, 479 US 575.]

Just because the Court in *Spring* concluded that the defendant's waiver was valid because it was knowing and intelligent certainly does not mean that the Court's enunciation of the relevant standard for making that determination is dicta. Quite the contrary, definition of the relevant standard of review before applying that standard to the facts of a case is an integral part of any competent appellate opinion, and certainly is part of the holding.

C

Limiting the constitutional protection served by the knowing and intelligent prong by superimposing *Con-*

*nelly*'s[1] requirement of coercive police conduct before a waiver is found involuntary, the lead opinion muses that "given the incongruity between the clear language and logic of *Connelly* and the dicta in *Spring*, courts have been left to question whether the knowing and intelligent prong of the waiver analysis is a wholly subjective inquiry that focuses only on the suspect's post hoc claims regarding the warnings." *Ante*, p 19. Although ultimately "reject[ing] the prosecutor's position that *Connelly* limited the entire waiver analysis—both the voluntary and knowing and intelligent prongs—to a wholly objective inquiry that focuses only on police behavior," *ante*, p 26, the lead opinion relies on selective citations of federal circuit court opinions to posit an alleged "inconsistency" between *Connelly* and *Spring*. In fact, this inconsistency does not exist.

In *Miller v Dugger*, 838 F2d 1530, 1535 (CA 11, 1988), the court stated: "It is now clear, however, that the requirements of *Miranda*'s prophylactic rules can diverge significantly from the force of the prohibition in the due process clause itself ·against the introduction of involuntary statements." This divergence is clear, of course, because *Miranda* is the case in which the "knowing and intelligent" prong of a waiver analysis was enunciated. "The prohibition against the introduction of involuntary statements long predates *Miranda*, and *Miranda* was not the first case in which the Supreme Court imposed rules on state courts to protect against the use of involuntary confessions." 838 F2d 1535. *Miranda* explained that effectuation of a suspect's right to "be warned that he

---

[1] *Colorado v Connelly*, 479 US 157; 107 S Ct 515; 93 L Ed 2d 473 (1986).

has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney" may be waived "provided the waiver is made voluntarily, knowingly and intelligently." 384 US 444.

The United States Court of Appeals for the Eleventh Circuit noted that "the Supreme Court in *Connelly* explained that 'voluntariness' in the context of a *Miranda* waiver means the same thing as 'voluntariness' in the due process context, i.e., freedom from official coercion . . . . The Supreme Court has stated explicitly, however, that a valid waiver of *Miranda* rights must not only be voluntary; it must also be *intelligently* made." 838 F2d 1538 (emphasis in original). The Eleventh Circuit relied on a pre-*Connelly* case, *Edwards v Arizona*, 451 US 477; 101 S Ct 1880; 68 L Ed 2d 378 (1981), as evidence of the irrefutably distinct prongs of a waiver inquiry: "The Supreme Court could not have stated more clearly that an uncounselled statement must be both voluntary and made after a knowing and intelligent waiver of the *Miranda* rights to be admissible." 838 F2d 1538 (citing *Edwards*, 451 US 483-484). The court ended its discussion of *Connelly* as follows: "We do not read the *Connelly* decision as demonstrating an intent by the Supreme Court to eliminate this distinction between voluntariness and knowing waivers." 838 F2d 1539. "The question of whether Connelly had *intelligently* waived his *Miranda* rights was not presented to the Supreme Court." *Id.* (emphasis in original).

In *Derrick v Peterson*, 924 F2d 813, 820 (CA 9, 1990), the court, in a poorly reasoned opinion, selectively cited *Connelly*:

While *Connelly* clearly holds that the "voluntariness" inquiry in the *Miranda* waiver context is equivalent to the voluntariness inquiry under the fourteenth amendment, it is not as clear whether an inspection of the "knowing" and "intelligent" prong of the *Miranda* waiver analysis is likewise rendered unnecessary by a conclusion that a confession is voluntary under the fourteenth amendment. That is the burden of our next inquiry.

The *Derrick* court then finally acknowledged:

Whatever doubt remained after *Connelly* concerning the distinct nature of the knowing and intelligent prong of the waiver inquiry was removed by the Court's decision in *Colorado v Spring* . . . later that same term.

\*     \*     \*

Thus, in light of *Spring*, it is clear that, although a determination of voluntariness under the fourteenth amendment forecloses a similar inquiry in the *Miranda* waiver context, we must conduct a separate review of whether Derrick knowingly and intelligently waived his *Miranda* rights. [*Id.*]

And in *United States v Bradshaw*, 290 US App DC 129, 134; 935 F2d 295, 302 (1991), yet another federal appellate court acknowledged the irrefutable distinctness of the two prongs of a *Miranda* waiver analysis: "But any doubts we might have concerning *Connelly*'s reach dissipate in light of the Court's subsequent decision in *Colorado v Spring* . . . ."[2] "We agree with the Ninth Circuit that this statement dispels any notion

---

[2] The District of Columbia Circuit quoted the same excerpt from *Spring* as did the Ninth Circuit in *Derrick*, an excerpt in which the United States Supreme Court clearly demonstrated, by quoting from *Moran v Burbine* and *Fare v Michael C*, 442 US 707; 99 S Ct 2560; 61 L Ed 2d 197 (1979), that it was not enunciating for the first time the two distinct dimensions of a *Miranda* waiver.

that a *Miranda* waiver must be caused by police misconduct to be deemed non-knowing." *Id.* (citing *Derrick v Peterson* and *Miller v Dugger*).

An attentive reading of *Connelly* shows that the Court was concerned solely with the voluntariness prong of a *Miranda* waiver. Keeping in mind that fact, and the fact that *Connelly* was decided after *Fare v Michael C*, 442 US 707; 99 S Ct 2560; 61 L Ed 2d 197 (1979), *Edwards v Arizona*, and *Moran v Burbine*, *supra* (among others, all of which unequivocally posit the discrete nature of the voluntariness inquiry from the knowing and intelligent inquiry), creating an "apparent inconsistency between the voluntary and knowing and intelligent prongs of the waiver analysis," *ante*, p 26, is an indefensible position. And more importantly, even if there were an arguable inconsistency or tension between the analysis of the voluntariness prong and the analysis of the knowing and intelligent prong, we would still be obligated to apply the unambiguous dictate of *Colorado v Spring*, which "dispels any notion that a *Miranda* waiver must be caused by police misconduct to be deemed nonknowing." *Bradshaw*, *supra* at 134. However, I can find no such inconsistency or tension.

Before discussing the self-imposed confusion evidenced by portions of the *Derrick* and *Bradshaw* opinions,[3] I would point out that it is logically inconsistent to even attempt to apply the notion of police coercion to an inquiry of what a suspect understood. "Coerce" means "to force; compel; to effect by force." *Webster's New World Dictionary*. It is obvious, then,

---

[3] Actually, as I subsequently discuss, the confusion was engendered by the *Derrick* court; the *Bradshaw* court uncritically parroted the *Derrick* court's confusion.

that "coerced" is an antonym of "voluntary" (and, of course, a synonym of "involuntary"). The relevance of coercion to a voluntariness inquiry is obvious and unmistakable. However, the concept of coercion or compulsion bears no relation, logically or otherwise, to a suspect's level of comprehension of the rights at issue. But, having said that, let us go on to examine the "logic" that led the *Derrick* and *Bradshaw* panels to see tension where none exists.

The lead opinion states:

> In addressing Derrick's claim that his waiver was not knowing and voluntary, the court examined the United States Supreme Court's decision in *Connelly* and stated:
>
> "While *Connelly* clearly holds that the 'voluntariness' inquiry in the *Miranda* waiver context is equivalent to the voluntariness inquiry under the fourteenth amendment, it is not as clear whether an inspection of the 'knowing' and 'intelligent' prong of the *Miranda* waiver analysis is likewise rendered unnecessary by a conclusion that a confession is voluntary under the fourteenth amendment." [924 F2d 820.]
>
> After noting the Supreme Court's citation in *Spring* of the waiver standard articulated in *Moran*, the court concluded that, "although a determination of voluntariness under the fourteenth amendment forecloses a similar inquiry in the *Miranda* waiver context, we must conduct a separate review of whether Derrick knowingly and intelligently waived his *Miranda* rights." *Id.* [*Ante,* pp 23-24.]

In fact, after quoting the excerpt from *Spring*—an excerpt that itself relies on quotations from the pre-*Connelly* opinions in *Moran v Burbine* and *Fare v Michael C*—what the *Derrick* court actually said was: "*Thus, in light of* Spring, *it is clear that,* although a determination of voluntariness under the fourteenth amendment forecloses a similar inquiry in the

*Miranda* waiver context, we must conduct a separate review of whether Derrick knowingly and intelligently waived his *Miranda* rights." 924 F2d 820 (emphasis added).[4]

The lead opinion also states: "The *Derrick* court readily acknowledged, however, that such a result 'as a matter of logic' is unsatisfactory." *Ante*, p 24. "[R]eadily acknowledged" is a risibly self-indulgent characterization; rather, the *Derrick* court gratuitously and, I suggest, erroneously theorized:

> As a matter of logic this result is somewhat unsatisfactory. On the one hand, *Connelly* emphasizes that "mere examination of the confessant's state of mind can never conclude the due process inquiry." 479 US 165 . . . . Yet, in the *Miranda* context, the Court allows a waiver to be invalidated based only upon the confessant's state of mind—i.e. based only upon whether the waiver is knowing and intelligent. See *Spring*, 479 US 573 . . . . Thus, the Court requires that there be improper state action under the fourteenth amendment before a confession can be suppressed, but requires no such state action in the *Miranda* context, even though the constitutional provision underlying the *Miranda* warning—the fifth amendment—is applied to the states through that same fourteenth amendment . . . . See *Malloy v Hogan*, 378 US 1, 8; 84 S Ct 1489; 12 L Ed 2d 653 (1964) (incorporating fifth amendment's self-incrimination clause). [924 F2d 820-821.]

The error in this analysis results from the court's fallacious assumption of a complete unity between the determinative factors of the pre-*Miranda* Fourteenth Amendment due process analysis (which was con-

---

[4] And in eventually conceding that the bifurcated inquiry is mandated by binding United States Supreme Court case law, the *Derrick* court expressly acknowledged "that we are *obligated* to bifurcate the *Miranda* waiver analysis . . . ." 924 F2d 821 (emphasis added).

cerned solely with coercive police conduct that affected the voluntariness of a suspect's confession)[5] and the post-*Miranda* waiver analysis (which requires analysis of two distinct prongs, only one of which— i.e., voluntariness—is logically, or in any other respect, related to coercive police practices). The *Derrick* court appears confused when it says that "the [Supreme] Court requires that there be improper state action under the Fourteenth Amendment before a confession can be suppressed, but requires no such state action in the *Miranda* context . . . ." 924 F2d 821. In *Connelly*, wherein the Supreme Court reviewed the holding of the Colorado Supreme Court that Connelly's confession was involuntary under both the Fourteenth Amendment Due Process Clause and *Miranda*, the Court held that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment," 479 US 167, and that "[t]here is obviously no reason to require more in the way of a 'voluntariness' inquiry in the *Miranda* waiver context than in the

---

[5] In *Connelly*, the Supreme Court explained that "coercive government misconduct was the catalyst for this Court's seminal confession case, *Brown v Mississippi*, 297 US 278 [56 S Ct 461; 80 L Ed 682] (1936)." 479 US 163. In *Brown*, "police officers extracted confessions from the accused through brutal torture." *Id.* In addition to the pre-*Miranda* cases cited in *Connelly*, 479 US 163, n 1, see *Haynes v Washington*, 373 US 503; 83 S Ct 1336; 10 L Ed 2d 513 (1963); *Lynumn v Illinois*, 372 US 528; 83 S Ct 917; 9 L Ed 2d 922 (1963); *Townsend v Sain*, 372 US 293; 83 S Ct 745; 9 L Ed 2d 770 (1963); *Rogers v Richmond*, 365 US 534; 81 S Ct 735; 5 L Ed 2d 760 (1961); *Blackburn v Alabama*, 361 US 199; 80 S Ct 274; 4 L Ed 2d 242 (1960); *Spano v New York*, 360 US 315; 79 S Ct 1202; 3 L Ed 2d 1265 (1959); *Watts v Indiana*, 338 US 49; 69 S Ct 1347; 93 L Ed 1801 (1949); *Turner v Pennsylvania*, 338 US 62; 69 S Ct 1352; 93 L Ed 1810 (1949); *Harris v South Carolina*, 338 US 68; 69 S Ct 1354; 93 L Ed 1815 (1949); *Malinski v New York*, 324 US 401; 65 S Ct 781; 89 L Ed 1029 (1945); *Ward v Texas*, 316 US 547; 62 S Ct 1139; 86 L Ed 1663 (1942).

Fourteenth Amendment confession context." *Id.* at 169-170. Unmistakably, then, coercive police conduct is as necessary to a finding of involuntariness under *Miranda* as it is under the substantive protection of the Fourteenth Amendment Due Process Clause. It is only with respect to the completely distinct "knowing and intelligent" prong of a *Miranda* waiver analysis— a prong never considered under the pre-*Miranda* due process analysis—that coercive police conduct is not required, either by logic or by law.

That brings me to the final aspect of the *Derrick* court's fabrication of a logical inconsistency: the notion that *Miranda* should be no more protective of a suspect's rights than is the Fourteenth Amendment Due Process Clause because that clause is the vehicle by which the protections of the Fifth Amendment are applicable to the states. *Derrick*, 924 F2d 821. The refutation of that assertion is not difficult.

Before the Fifth Amendment was incorporated into the Fourteenth, the only substantive protection afforded by the Fourteenth Amendment was the prohibition against coercive police conduct that rendered a suspect's confession (or other statement) involuntary and therefore inadmissible. But ever since *Miranda*, the Self-Incrimination Clause of the Fifth Amendment, which was incorporated into the Fourteenth Amendment in *Malloy v Hogan, supra*, has been understood to require that a suspect's decision to waive his Fifth Amendment rights be both "voluntary" and "knowing and intelligent." As should be obvious, then, the substantive content of, and the substantive protections afforded by, the Fourteenth Amendment are greater after incorporation than they were before.

D

The lead opinion also mischaracterizes the relevant case law with regard to the specific issue of police conduct. It acknowledges that coercive police conduct is not a prerequisite for finding a *Miranda* waiver invalid under the knowing and intelligent prong, and therefore concludes that the knowing and intelligent prong requires a purely "subjective inquiry." *Ante*, p 26. This is not completely accurate.

Both prongs must be analyzed under the "totality of the circumstances surrounding the interrogation," and therefore any relevant police conduct *would be* equally applicable. The only clear-cut difference is that coercive police conduct is a sine qua non for a judicial finding of involuntariness; coercive conduct is only relevant to the concept of voluntariness. There is no requirement for evidence of police conduct of any particular sort to find a waiver invalid under the knowing and intelligent prong, but any police conduct that could have an effect on a suspect's requisite level of comprehension must be factored into the analysis. This, too, was clear before *Connelly* and *Spring*.

In *Moran v Burbine*, the defendant argued that his "confessions must be suppressed because the police's failure to inform him of the attorney's telephone call deprived him of information essential to his ability to knowingly waive his Fifth Amendment rights." 475 US 421. In finding that the police's failure to inform the defendant of an attorney's attempt to contact him did not affect the defendant's "full awareness and comprehension of all the information *Miranda* requires the police to convey," the Supreme Court stated: "Granting that the 'deliberate or reckless' withholding of information is objectionable as a matter of ethics,

such conduct is only relevant to the constitutional
validity of a waiver if it deprives a defendant of
knowledge essential to his ability to understand the
nature of his rights and the consequences of aban-
doning them." *Id.*, pp 423-424. And although *Miranda*
originally required that suspects be given the specific
warnings enunciated in that opinion, the Supreme
Court has since held that the standard *Miranda* warn-
ings are not constitutionally required. The initial judi-
cial focus under the knowing and intelligent prong in
such cases, therefore, is what information was (or
was not) conveyed to the suspect, and how that infor-
mation affected the suspect's comprehension of the
guarantees of the Fifth Amendment. See *Oregon v
Elstad*, 470 US 298; 105 S Ct 1285; 84 L Ed 2d 222
(1985); *New York v Quarles*, 467 US 649; 104 S Ct
2626; 81 L Ed 2d 550 (1984); *Michigan v Tucker*, 417
US 433; 94 S Ct 2357; 41 L Ed 2d 182 (1974). Though
the ultimate focus for purposes of the knowing and
intelligent prong remains on the level of the suspect's
comprehension, it is clear that police conduct can be
relevant, except, of course, coercive police conduct,
which is logically and lexically unrelated to analysis
of a suspect's comprehension.

E

The lead opinion also attempts to link the analyses
of *Connelly* and *Spring* by focusing on the exclusion-
ary rule. As a threshold matter, I would point out that
any discussion of the exclusionary rule is unrelated to
the actual case before us, and therefore mere dicta.
The judgment in this case is that defendant's waiver
was valid; obviously, then, the issue of exclusion is in
no way implicated.

The lead opinion relies on the following excerpt from *Bradshaw*:

> "To be sure, some of the reasoning in the section of *Connelly* dealing with the due process voluntariness standard could be applicable to our case as well. The Court, for example, observed that evidence should not be excluded unless suppression would deter future constitutional violations, *see* [479 US 166]. Since the police may not know whether an individual does not or cannot understand *Miranda* warnings (the government claims here that the police were not aware of Bradshaw's illness), an argument could be made that in those circumstances, deterrence is inapposite." [*Ante*, p 25 (emphasis added) (quoting *Bradshaw*, 290 US App DC 133; 935 F2d 299).]

First of all, this excerpt immediately follows the *Bradshaw* court's explicit acknowledgment of its understanding that police coercion is not and cannot be the focus of judicial inquiry under the knowing and intelligent prong. That by itself evidences the improbity of the lead opinion's reading of that case. But even more important is the obvious fact that deterrence of coercive police conduct is by definition inapposite to whether a *Miranda* waiver was invalid because it was not knowing and intelligent; this is a mere truism. However, if a suspect's *Miranda* waiver was not knowing and intelligent because of police conduct that "deprive[d] a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them," *Moran v Burbine*, 475 US 424, then deterrence would be directly apposite. And the most important fact in this regard is that deterrence is not the overarching consideration: the protection and vindication of constitutional rights is.

II

In sum, then, I join only the following parts of the lead opinion: I; IV(A), (B), (C) (except for the two references to the elements of a knowing and intelligent waiver "under *Moran*," *ante*, pp 30, 34; the relevant case in this regard is *Spring*, not *Moran*), (E); and V.

MALLETT, J. (*concurring*). Because I agree that the defendant understood, albeit at a very basic level, the rights afforded him under *Miranda*,[1] I agree with the result reached by the majority. The trial court did not clearly err in finding that Mr. Cheatham did in fact understand that he could keep silent, that if he did say anything the state could use whatever he said as evidence against him, and that he could have an attorney to represent him. I write separately to emphasize that the requirement that a waiver of *Miranda* rights be knowingly and intelligently made means that the officers securing the waiver must explain those rights in plain, simple English, or in non-English, or whatever may be required to assure that the individual waiving his rights truly understands.

This defendant, with an IQ suggestive of mild mental retardation, apparently did understand the nature and consequences of the rights waived. However, I am deeply troubled by the possibility that the decision we reach today could be interpreted as endorsing the standard *Miranda* litany as sufficient when securing a waiver from individuals with impaired or "below normal" mental abilities.

The court in *United States v Yunis*, 273 US App DC 290; 859 F2d 953 (1988), effectively explained the

---

[1] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

"knowing and intelligent" requirement in the context of a non-English-speaking defendant. In holding that the Arabic translation of the warnings was sufficient to apprise the suspect of his rights, the court emphasized that

> as the *Miranda* decision itself suggests, *the focus must be on the plain meaning of the required warnings.* A defendant must comprehend, for example, that he really does not have to speak; he must recognize that anything he says actually will be used by the state against him. [*Id.* at 301-302 (emphasis added).]

I agree that the focus of inquiry must be on the plain meaning of the warnings and emphasize that the warnings must be *plain.* The validity of a waiver does not depend on a verbatim recitation of the *Miranda* litany, but rather depends on an actual understanding on the part of the individual of his *Miranda* rights and the consequences of waiving them. *Colorado v Spring*, 479 US 564; 107 S Ct 851; 93 L Ed 2d 954 (1987). While it is true that an officer can never definitively ascertain that an individual has actual understanding, the officer must use caution and engage in a good-faith effort when obtaining a waiver to assess the suspect's level of understanding. The officer must make an effort to ensure that the consequences of making an in-custody statement to the police are clearly understood.

LEVIN, J. (*dissenting*). I would affirm the decision of the Court of Appeals for the reasons stated in its unpublished opinion.[1]

---

[1] *People v Cheatham*, issued January 11, 1995 (Docket No. 155010).

The Court of Appeals said that it was left with the definite and firm conviction that the trial court made a mistake in finding[2] that Cheatham had knowingly waived his Miranda[3] rights, and said:

> The testimony at the suppression hearing overwhelmingly indicated that defendant did not have the intellectual ability to understand his rights. When asked at the hearing about his educational background, defendant did not respond by identifying which schools he had attended or what grade he had achieved. He simply stated that he could not read. When asked a question of any complexity, defendant's answers were unresponsive. Defendant testified that he did not understand the rights when they were read to him, although he indicated to the police officer otherwise. In addition, the uncontradicted testimony of the psychologist was that defendant had an IQ of 62, was mentally retarded and functionally illiterate. The psychologist testified that defendant would not have been able to understand the Miranda rights and that he could not competently waive them.
>
> The police officers' testimony that defendant seemed to understand the Miranda rights is not enough, in the face of the psychologist's testimony to the contrary and defendant's demonstrated inability to understand complex questions, to support the trial court's finding that defendant understood and knowingly waived his Miranda rights. We conclude that the trial court erred in finding that defendant understood his rights and in failing to suppress defendant's statement at trial.
>
> The admission of defendant's statement cannot be harmless error. Although defendant did not admit to shooting the victim, defendant acknowledged that he was present at the murder scene and further acknowledged that after the shooting he threw a .38 revolver into an alley. Evidence was introduced at trial that a bullet from that .38 revolver was

[2] MCR 2.613(C); Tuttle v Dep't of State Hwys, 397 Mich 44, 46; 243 NW2d 244 (1976).

[3] Miranda v Arizona, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

found at the murder scene and spent shell casings from the same gun were found in his pocket.

Plaintiff argues that because there was no evidence of police coercion, defendant's statement was voluntary and there was no basis on which to suppress it, citing *Colorado v Connelly*, 479 US 157; 107 S Ct 515; 93 L Ed 2d 473 (1986). Plaintiff fails to appreciate the distinction between whether the waiver of defendant's *Miranda* rights was voluntary, an issue which cannot be resolved in defendant's favor absent some police coercion, *Colorado v Connelly, supra,* and *whether the otherwise voluntary waiver was knowing and intelligent.* [*People v Garwood*, 205 Mich App 553, 555; 517 NW2d 843 (1994).] A waiver which was not knowing and intelligent warrants suppression of the statement independent of any coercive police conduct. [Emphasis added.]

In *Colorado v Connelly, supra* at 167, cited by the Court of Appeals, the United States Supreme Court repeatedly referred to the "voluntariness" prong of the standard for determining whether *Miranda* rights were waived, but did not mention the "knowing" prong. Later in the same term, the Court, in *Colorado v Spring*, 479 US 564, 573; 107 S Ct 851; 93 L Ed 2d 954 (1987), recognized that both prongs of the analysis were applicable:

"First the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." [Citation omitted.]

The Court went on in *Spring* to note that the confession in that case was voluntary, citing *Connelly*, before discussing whether the waiver of the "Fifth Amendment privilege was knowingly and intelligently made . . . ." *Id.* at 574. The Court's analysis implies that a person who could not know could not waive his rights:

> In this case there is no allegation that Spring failed to understand the basic privilege guaranteed by the Fifth Amendment. Nor is there any allegation that he misunderstood the consequences of speaking freely to the law enforcement officials. In sum, we think that the trial court was indisputably correct in finding that Spring's waiver was made knowingly and intelligently within the meaning of *Miranda*. [*Id.* at 575.]