# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

          Plaintiff-Appellee,

v

MARIAH THOMAS,

          Defendant-Appellant.

UNPUBLISHED
October 25, 2018

No. 335071
Wayne Circuit Court
LC No. 16-000209-02-FC

PEOPLE OF THE STATE OF MICHIGAN,

          Plaintiff-Appellee,

v

JEBRIE CROSS,

          Defendant-Appellant.

No. 335669
Wayne Circuit Court
LC No. 16-000209-01-FC

Before: MURRAY, C.J., and BORRELLO and RONAYNE KRAUSE, JJ.

PER CURIAM.

In these consolidated appeals, defendants Mariah Thomas and Jebrie Cross each appeal as of right their convictions arising from an offense involving the firebombing of a house. Two persons died in the house fire and a third victim survived. Defendants were tried separately, each before a jury. The juries convicted each defendant of two counts of first-degree felony murder, MCL 750.316(1)(b), and one count of first-degree arson, MCL 750.72. In addition, Thomas was convicted of an additional count of assault with intent to commit murder, MCL 750.83, and Cross was convicted of an additional count of assault with intent to do great bodily harm less than murder, MCL 750.84. The trial court sentenced Thomas to life imprisonment without parole for each murder convictions, and a parolable life term for the assault conviction. The court sentenced Cross as a fourth-offense habitual offender, MCL 769.12, to life imprisonment without parole for each murder conviction and 10 to 20 years in prison for the assault conviction. We affirm in each appeal.

## I. OVERVIEW OF THE FACTS

-1-

Defendants' convictions arise from their involvement in the firebombing of a house that led to the deaths of Jana John (Jana) and James Jordan (James). A third occupant of the house, Jalen John (Jalen), suffered fire-related injuries, but survived. Jana and James had been dating for a short period before the fire. James was Thomas's former boyfriend and the father of Thomas's child. On December 13, 2015, Thomas and codefendant Daquana Williams were driving by Jana's home and saw both James and Jana on the porch outside the house. Thomas stopped her vehicle, following which both she and Williams became involved in a verbal and physical confrontation with Jana, James, and Jana's sister. Williams sustained facial injuries from being assaulted by Jana and her sister. According to witnesses, Thomas and Williams left the house after the police were called, but Thomas threatened to return later and "shoot the place up."

The prosecution's theory of the case was that after Thomas and Williams left, they recruited others, including defendant Cross, to join them in returning to Jana's home to retaliate for the earlier assault. Before returning to Jana's house, Thomas, who was driving the group in her vehicle, stopped at a gas station. Defendant Cross then filled at least one, and up to three, bottles with gasoline. The group parked a few blocks away from Jana's house and approached on foot. One or more lighted glass bottles containing gasoline were thrown at the house, causing an intense, rapidly spreading house fire. Jana and James, who were asleep in an upstairs bedroom, died of smoke inhalation and burns. Jana's brother, who was asleep in the living room, suffered injuries from the fire but survived. Fearing retaliation from the fight, other family members who resided at the house had left earlier and spent the night at a hotel.

A codefendant, Tre'era Davis, who was present when the firebombing occurred, pleaded guilty to second-degree murder and testified at trial. Davis testified that Cross made statements in the car as they drove to the victims' house about firebombing in particular that he planned to throw a bottle of gasoline at the house to get the victims to run out. Davis testified that she saw only Cross throw a bottle at the house. Afterward, however, when they were discussing the incident, Davis heard Thomas say that both she and Cross had thrown bottles at the house.

Thomas testified at her trial and admitted being involved in the earlier fight, but denied that she wanted to return to the house to continue the confrontation. She also denied that she ever intended to firebomb the house and denied knowing that Cross had filled any bottles with gasoline. Thomas testified that it was Cross who wanted to return to the house after he saw the injuries to Williams, and she claimed that she was forced to go along with the others. The jury also heard Thomas's statement to the police, in which she stated that they bought the gasoline because Cross was going to "cocktail" the victims' house, but this was supposed to occur after the group fought the women who assaulted Thomas and Williams earlier. Thomas testified at trial that she did not know about the plan to firebomb the house and only learned afterward that Cross had thrown a lighted bottle with gasoline at the house.

At Cross's trial, the jury heard his statement to the police, in which he described Thomas's plan to firebomb the victims' house. Cross stated that he did not see who threw the bottles at the home, and he denied that he threw any bottles himself.

## II. DOCKET NO. 335071 (DEFENDANT THOMAS)

## A. REFUSAL TO INSTRUCT ON SECOND-DEGREE MURDER

Thomas argues that the trial court erred by refusing to instruct the jury on second-degree murder as a necessarily included lesser offense. We disagree. We review a trial court's determination whether a jury instruction applies to the facts of a case for an abuse of discretion. *People v Mitchell*, 301 Mich App 282, 286; 835 NW2d 615 (2013). To the extent that Thomas raises a question of law, including whether her right to due process was violated, our review is de novo. *People v Wilder*, 485 Mich 35, 40; 780 NW2d 265 (2010).

The trial court declined to instruct the jury on second-degree murder, reasoning as follows:

> I am not inclined to give it here. Two reasons.

> First of all, there is no imaginable logical theory that would support the defendant being guilty of second degree murder but not first degree felony murder. There just isn't any theory that would support that finding.

> Secondly, I don't know how I would present it to — I, I would just — it would just confuse the heck out of the jury.

> * * *

> And for what I — after I tell them what I have to tell them about felony murder and aiding and abetting, I don't know how I would squeeze in second degree murder as a lesser included offense here. It wouldn't make any sense at all.

> So I think it's either felony murder or nothing. At least on the homicide.

Thomas correctly observes that second-degree murder is a necessarily included lesser offense to felony murder. *People v Clark*, 274 Mich App 248, 257; 732 NW2d 605 (2007). Moreover, the trial court properly recognized that an instruction on second-degree is not automatically required in a felony-murder prosecution simply because it was requested. Instead, "a requested instruction on a necessarily included lesser offense is proper if the charged greater offense requires the jury to find a disputed factual element that is not part of the lesser included offense and a rational view of the evidence would support it." *People v Smith*, 478 Mich 64, 69; 731 NW2d 411 (2007).

Second-degree murder and felony murder both require (1) that the defendant caused the death of another person; and (2) malice, which is "the intention to kill, the intention to do great bodily harm, or the wanton and willful disregard of the likelihood that the natural tendency of the defendant's behavior is to cause death or great bodily harm." *People v Flowers*, 191 Mich App 169, 176; 477 NW2d 473 (1991). The element that distinguishes felony murder from second-degree murder is that for felony murder, the death must have occurred during the commission or attempted commission of an enumerated felony, one of which is arson. *Clark*, 274 Mich App at 257; MCL 750.316(1)(b).

Therefore, an instruction on second-degree murder would have been appropriate only if a rational view of the evidence could establish malice without relying on the predicate felony. Here, the prosecution relied exclusively on the evidence of the arson to establish malice. Thomas claimed that she went to the house only intending to fight the women there in retaliation for the earlier assault against her and Williams. However, there was no evidence that Thomas or any of the others who were with her attempted to confront the occupants of the house before the house ignited. Conversely, there was substantial evidence that Thomas: (1) recruited the others to join her in returning to the victims' house, (2) drove, (3) stopped at the gas station where the gasoline used to make the Molotov cocktail was purchased, (4) knew that Cross intended to throw the Molotov cocktail at the house, and (5) may have thrown a gasoline-filled bottle herself. Because the only logical theories of malice revolve around Thomas' commission of arson, the predicate felony required for her felony murder conviction, the trial court was correct in its finding that an instruction on second-degree murder was unnecessary. Accordingly, the trial court did not err by refusing to instruct the jury on second-degree murder.

Furthermore, even if the trial court erred by declining to instruct the jury on second-degree murder, the error was harmless. *People v Anderson (After Remand)*, 446 Mich 392, 405-406; 521 NW2d 538 (1994). Thomas argues that the jury might conceivably have found that she did not commit, or aid or abet in the commission of, arson; and found instead that she acted in wanton and willful disregard of human life sufficient to establish culpability for second-degree murder. However, the jury *did* convict Thomas of arson, showing that the jury believed beyond a reasonable doubt the evidence of Thomas's guilt. Because the jury found that the predicate felony was proven beyond a reasonable doubt, any error in failing to give an instruction on second-degree murder was harmless.

## B. DEFENDANT THOMAS'S STANDARD 4 BRIEF

Defendant Thomas raises additional issues in a supplemental brief filed pursuant to Supreme Court Administrative Order No. 2004-6, Standard 4 ("Standard 4 brief").

## 1. INEFFECTIVE ASSISTANCE OF COUNSEL

Thomas raises several claims in which she contends that she was denied her right to the effective assistance of counsel. Thomas did not raise these claims in a motion for a new trial in the trial court, and this Court denied Thomas's motion to remand. Our review of this issue is therefore limited to errors apparent from the record. *People v Matuszak*, 263 Mich App 42, 48; 687 NW2d 342 (2004). We appreciate that this Court's denial of Thomas's motion to remand appears to place Thomas in a "Catch-22" situation, under which this Court has precluded her from making a record with which to support her argument in this Court. However, our review of the record and Thomas's arguments reveals no basis to conclude that a remand would have been even potentially productive. Consequently, we are unable to find Thomas prejudiced by limiting our review to the record.

To establish ineffective assistance of counsel, Thomas must show that counsel's performance fell below an objective standard of reasonableness, and that the representation so prejudiced Thomas that she was denied her right to a fair trial. *People v Pickens*, 446 Mich 298, 338; 521 NW2d 797 (1994). Thomas must overcome the presumption that the challenged action

-4-

might be considered sound trial strategy. *People v Tommolino*, 187 Mich App 14, 17; 466 NW2d 315 (1991). To establish prejudice, Thomas must show a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *People v Johnnie Johnson, Jr*, 451 Mich 115, 124; 545 NW2d 637 (1996). The burden is on Thomas to produce factual support for her claim of ineffective assistance of counsel. *People v Hoag*, 460 Mich 1, 6; 594 NW2d 57 (1999).

Thomas's first complaint is that defense counsel was habitually unprepared and did not complete a thorough investigation of her case. Her first claim is that defense counsel was unprepared for a pretrial suppression hearing because she failed to view Thomas's entire 11-hour video-recorded police interview. In support of this argument, Thomas relies on the following statement made by counsel at the hearing on Thomas's motion to suppress her statement:

> In talking to my client over and over, and the reason why I didn't put it in the motion was that she had, she had said it to me [about the assurances], but I needed to look at the video, and the video is 11 hours long and I would look at it, fall asleep, look at it, you know. Um, is that she said that he told her everyone has went [sic] home.

We are not persuaded. Although counsel stated that she fell asleep while watching the interview, she added that she awoke and continued watching the recording. She never stated that she did not watch the entre interview. Indeed, she stated to the trial court that she watched it three times. Further, it is apparent from counsel's arguments that she was familiar with what occurred during the interview. Nothing in the record supports Thomas's argument that counsel was unprepared to argue the motion to suppress.

In any event, even if counsel had been unprepared, that lack of preparation was not prejudicial. Thomas principally asserted that her statement should be suppressed because police assured her that she could go home if she cooperated and gave a statement to the police. At the suppression hearing, defense counsel conceded that she was unable to locate any portion of the interview where the police actually assured Thomas that she could go home if she gave a statement. As noted, counsel informed the court that she had watched the recording three times. Counsel mentioned, however, that there was a problem with the recording because a portion of the audio was not decipherable. This same problem also existed on the prosecutor's copy of the recording. Despite this problem, the trial court denied Thomas's motion to suppress because she claimed that the police told her that her mother was released after giving a statement. The trial court reasoned that, even if true, this would not have reasonably induced Thomas to make a statement because her mother was not a suspect in the case.

Thomas additionally appears to rely on statements made by counsel during pretrial hearings that counsel was unprepared for trial. However, those statements were made in the context of counsel advising the court that she was in the process of obtaining additional discovery materials. Counsel assured the court that she otherwise was prepared for the scheduled trial date, and nothing in the record indicates that counsel did not obtain all necessary discovery materials before trial and was not adequately prepared on the date of trial. Thomas has not established any factual support for her claim that counsel was unprepared for trial.

Thomas' second claim regarding preparation and investigation is that her aunt was asked to prepare the defense's closing argument. Nothing in the record supports this argument, and, critically, Thomas has failed to offer any affidavit or other offer of proof in support of this claim. Accordingly, there is no basis for finding that defense counsel was ineffective, or that remand for further proceedings regarding this claim is warranted.

Thomas' third claim regarding preparation and investigation is that defense counsel failed to obtain complete discovery, relied on notes made by Thomas, and relied on evidence presented by the prosecution. Again, Thomas fails to cite any record support for these claims, and she has not submitted any affidavits or other offers of proof in support of this argument. Thomas has not demonstrated that counsel was ineffective or that a remand for an evidentiary hearing is warranted.

Thomas' fourth claim regarding preparation and investigation is that defense counsel advised the court that the defense intended to call witnesses, but then did not call any witnesses and did not even interview them. Once again, Thomas has not cited any portion of the record in support of this argument, and she has not provided any affidavits from potential witnesses who were not called to demonstrate that they could have provided favorable testimony that might have made a difference in the outcome of trial.

In sum, the record does not support Thomas's various claims related to defense counsel's preparation and investigation. Further, given Thomas's failure to demonstrate factual support for her various arguments, she is not entitled to remand for an evidentiary hearing on her claims. See *People v McMillan*, 213 Mich App 134, 141-142; 539 NW2d 553 (1995), and *People v Simmons*, 140 Mich App 681, 685; 364 NW2d 783 (1985).

Thomas' second contention is that defense counsel was ineffective for not objecting to the trial court's alleged failure to rule on all aspects of her motion to suppress. The trial court denied the motion to suppress because Thomas failed to establish that her statement had been illegally obtained. Thomas argued that she was told that her mother was allowed to go home after giving a statement. The court reasoned that this knowledge would not have reasonably induced Thomas to give a statement because Thomas knew that her mother was not a suspect. Although another basis for Thomas's motion was that the police assured Thomas that she would be able to go home if she gave a statement, defense counsel admitted that she could not identify any portion of the interview where such assurances were made.[1]

Recognizing, however, that there was a problem with the audio in a portion of the recorded interview, the court expressed its willingness to revisit the motion if a corrected copy of the recording was obtained and showed that Thomas was induced to give a statement with false assurances that she would be allowed to go home. If we had been presented with any evidence that a corrected recording existed and contained such inducements, we would be concerned by

---

[1] Thomas has not established that she was prejudiced because defense counsel did not bring her own copy of the recorded interview to the motion hearing and had to rely on the prosecutor's copy. The record indicates that both copies were similarly flawed.

counsel's performance in failing to obtain that recording. However, in the absence of so much as an offer of proof, we are unable to speculate that a corrected recording existed for counsel to find. Consequently, we are unable to find that defense counsel was ineffective for failing to revisit or reargue this issue.

Thomas' third contention is that defense counsel was ineffective for not objecting to the prosecutor's closing argument. As discussed in Section II.B.2., *infra*, the challenged remarks were supported by the evidence and reasonable inferences arising from the evidence. Because any objection would have been futile, counsel was not ineffective for failing to object. *People v Darden*, 230 Mich App 597, 605; 585 NW2d 27 (1998).

## 2. PROSECUTORIAL MISCONDUCT

Thomas argues that reversal is required because the prosecutor made several statements during closing argument that were not supported by the evidence. Thomas concedes that there was no objection to the challenged remarks, leaving these claims unpreserved. An unpreserved claim of prosecutorial misconduct is reviewed for plain error affecting substantial rights. *People v Abraham*, 256 Mich App 265, 274; 662 NW2d 836 (2003). An error is plain if it is clear or obvious, and an error affects substantial rights if it is prejudicial, i.e., if it affects the outcome of the proceedings. *People v Jones*, 468 Mich 345, 355; 662 NW2d 376 (2003).

Thomas challenges the prosecutor's statements that Thomas was the only person in the group who knew the victims, in addition to statements that characterized Thomas as immature and jealous. Thomas contends that these statements lacked evidentiary support. Although Thomas does not cite the specific portions of the prosecutor's closing argument that she is challenging, we have reviewed them in their entirety, and we find no plain error.

The prosecutor argued that this incident was not about retribution for Williams being beaten, "but this is about James Jordan being with another woman." The prosecutor argued that Thomas organized the gathering of the others involved and went back to the victims' house to "save face" and to show Jana "what's what." Defense counsel argued that there was no evidence that Thomas wanted this incident to happen. Counsel further argued that because Williams and Cross were personally involved, it made more sense that Cross participated in this offense for Williams's sake. Thomas appears to object to the following portion of the prosecutor's rebuttal argument:

> Um, one of the things that all of you, um, I believe will be in agreement on is that none of these other people who have been mentioned throughout the pendency of this case know the deceased. No one else knows Jana John or James Jordan other than the defendant who's seated right here.
>
> And we know that that is completely uncontroverted because she said so when I asked her. She is the only one who knows these parties. She is the only connection.
>
> And yet today she wants you to believe that it's everybody else's fault but her's, and that for some reason all these other people had some kind of a dog in the fight. That Te'era Davis, even though we never heard this prior to today,

suddenly Te'era Davis is the villain and Te'era Davis, the same person who pled guilty and testified against the defendant in her trial, that, that's the same person. The same Te'era Davis who this defendant felt the need to protect and leave out of her initial statement. And then now suddenly she's ready to hang her out to dry as practically the ring leader.

But then we also heard the defendant say that, um, that it's all, all Jebbrie [sic] Cross. But then again she, she admits that he doesn't know these people. So why, why is he — does he wanna go over there and do this.

I submit to you that the most logical explanation is that which I've given you, that she has been done wrong. She is and was jealous that the man who she had a child with was with another woman. Cavorting around on the front porch with another woman so she gathered up her people. People who she enlisted and the proceeded forward to commit these crimes.

* * *

We know that this person, Daquana Williams did not know the people who died.

We know that she did, Mariah Thomas knew the people that died. And she is sitting here shaking her head, but she testified that she knew the people that died. Nobody else did. So that's something that you can consider as to why would that happen.

The test for prosecutorial misconduct is whether the defendant was denied a fair trial. *People v Bahoda*, 448 Mich 261, 266-267; 531 NW2d 659 (1995). Claims of prosecutorial misconduct are decided case by case and the challenged comments must be read in context. *People v McElhaney*, 215 Mich App 269, 283; 545 NW2d 18 (1996). A prosecutor is afforded great latitude during closing argument. The prosecutor is permitted to argue the evidence and reasonable inferences arising from the evidence in support of her theory of the case. *Id*. at 282.

Thomas has failed to show that the prosecutor's arguments were unsupported by the evidence. Even though the two eyewitnesses to the initial confrontation involving Thomas and Williams did not know Thomas at that time, the prosecutor's theory was that Thomas was the motivating force behind this crime because she was jealous of her child's father's new girlfriend, Jana. The prosecutor argued that Thomas was motivated to commit this offense because she knew James and was upset about Jana. Jana's brother and sister confirmed that it was Thomas who was at the house and confronted James and Jana. Thomas admitted to the police that she was at the house and was involved in a confrontation with James about their relationship. Even if Jana's brother and sister did not know Thomas beforehand, they were able to testify about the events that occurred. Other evidence established that Thomas was there at the time of the initial confrontation. The prosecutor could reasonably rely on the circumstances that led to the initial confrontation to argue that Thomas, rather than Williams, was the person who sought revenge against those with whom she had earlier fought. Because Thomas has failed to show that the prosecutor's arguments were improper, she has not demonstrated any plain error.

III.  DOCKET NO. 335669 (DEFENDANT CROSS)

The sole issue Cross raises on appeal is a claim that he received ineffective assistance of counsel.  Cross's claim is premised on counsel's alleged failure to properly procure an independent evaluation of Cross's competency to waive his constitutional rights when he agreed to a police interview.  We disagree.

As discussed, Cross must show that counsel's performance fell below an objective standard of reasonableness, and that the representation so prejudiced Cross that he was denied his right to a fair trial.  *Pickens*, 446 Mich at 338.  Cross properly preserved this issue by timely moving for a new trial.  Consequently, we review for clear error the trial court's factual findings, and we review de novo whether the facts as found by the trial court establish a violation of the defendant's right to the effective assistance of counsel.  *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002).

In *People v Howard*, 226 Mich App 528, 538; 575 NW2d 16 (1997), this Court stated:

> Statements of an accused made during custodial interrogation are inadmissible unless the accused voluntarily, knowingly, and intelligently waives his Fifth Amendment rights.  *Miranda v Arizona*, 384 US 436, 444; 86 S Ct 1602; 16 L Ed 2d 694 (1966); *People v Garwood*, 205 Mich App 553, 555-556; 517 NW2d 843 (1994).  Whether a waiver of *Miranda* rights is voluntary and whether an otherwise voluntary waiver is knowing and intelligent are separate questions.  *People v Cheatham*, 453 Mich 1, 27, 44; 551 NW2d 355 (1996); *Garwood, supra* at 555.  While the voluntariness prong is determined solely by examining police conduct, a statement made pursuant to police questioning may be suppressed in the absence of police coercion if the defendant was incapable of knowingly and intelligently waiving his constitutional rights.  *Garwood, supra*.  Whether a suspect has knowingly and intelligently waived his *Miranda* rights depends in each case on the totality of the circumstances, including the defendant's intelligence and capacity to understand the warnings given.  *Cheatham, supra* at 27, 44.

To knowingly waive *Miranda* warnings, a defendant is not required to understand the ramifications and consequences of choosing to waive or exercise the rights explained to him by the police.  *People v Daoud*, 462 Mich 621, 636; 614 NW2d 152 (2000).  "A very basic understanding of those rights is all that is necessary" and "[i]ntoxication from alcohol or other substances can affect the validity of a waiver, but is not dispositive."  *People v Gipson*, 287 Mich App 261, 265; 787 NW2d 126 (2010).  "To establish that a defendant's waiver of his Fifth Amendment right was knowingly and intelligently made, 'the state must present evidence sufficient to demonstrate that the accused understood that he did not have to speak, that he had the right to the presence of counsel, and that the state could use what he said in a later trial against him.' "  *People v Tierney*, 266 Mich App 687, 709; 703 NW2d 204 (2005).

In January 2016, defense counsel requested evaluations regarding Cross's criminal responsibility, competency to stand trial, and competency to waive his *Miranda* rights.  In March 2016, the trial court issued orders for Cross to be evaluated for criminal responsibility and

competency to stand trial, but delayed ordering that he be evaluated for competency to waive his *Miranda* rights until May 2016. In June 2016, Cross was found competent to stand trial, and in July 2016, Cross was found not mentally ill. While the parties were still waiting for completion of the evaluation of Cross's competency to waive his *Miranda* rights, the court advised defense counsel that there would not be much time to procure an independent evaluation of Cross should counsel wish to challenge the findings made by the Center for Forensic Psychiatry (CFP).

The CFP ultimately found Cross competent to waive his rights. During an evidentiary hearing to determine the admissibility of Cross's police interview, trial counsel advised the court that Cross's family had hired an independent psychologist to investigate whether Cross was competent to waive his rights. The court continued with the suppression hearing and, after reviewing the testimony, the video recording of Cross's interview, and the CFP report that Cross was competent to waive his rights, the trial court concluded that his statement was intelligently and voluntarily made.

Cross's trial began on August 30, 2016. Mid-trial, defense counsel advised the court that he had just received an independent forensic evaluation of Cross. The report had been prepared by Leslie Kaye, Ph.D., at the request of another attorney and without trial counsel's knowledge or involvement. In her evaluation, Kaye opined that Cross operated overall at a first-grade level, and she concluded that he was not competent to waive his *Miranda* rights. Defense counsel asked the court to either conduct a competency hearing and consider the independent evaluation, or allow the defense to add Kaye as a trial witness. The trial court denied counsel's requests, holding that Cross or his family were tardy in procuring the evaluation, the prosecutor was not provided with sufficient notice, and Kaye's qualifications as an expert witness were not established. The court specifically faulted Cross or his family, not trial counsel, for failing to timely offer Kaye as a witness. However, although the court refused to permit Kaye to testify, the court allowed Cross to submit Kaye's evaluation and her curriculum vitae for the record.

After he was convicted, Cross filed a motion for a new trial and requested an evidentiary hearing on his claim that defense counsel was ineffective for not properly pursuing the issue of Cross's competency to waive his constitutional rights. The trial court denied the motion, stating:

> Okay. Well, um, it appears to me that the delay in obtaining the independent report was not Mr. Blake's [trial counsel's] shortcoming. I think the record is clear. And I'm sort of remembering all of this as we're talking about it, too.
>
> It wasn't, to put it in layman's terms, it just wasn't Mr. Blake's fault. His family created, the defendant's family that is, a lot of confusing signals about a number of things in terms of the defense of Mr. Cross in this case. And one of them was their very delayed obtaining of an independent report.
>
> Now, you can say that's because Mr. Blake didn't adequately communicate that to them. But the, the explanation that Mr. Blake gave on the record, of course he wasn't subject to cross-examination at the time, put the entire delay on the family.

Then, then there is, as counsel for the People point out the, the really overwhelming evidence against Mr. Cross even without his confession. And although I'm not frankly in a position to say unabashedly that I would have still maintained my decision against suppressing the confession even if I had the expert's report in front of me, which I didn't and still don't, I, I was, while you were talking, glancing at the forensic report and noticing that the forensic examiner was of the opinion in some respects that Mr. Cross was exaggerating his symptoms. And that report fully supports this court's decision to deny the motion to suppress.

And I, I don't see what can be gained from examining Mr. Blake or Mr. Simon [the attorney who commissioned Kaye's report] for that matter or any one else involved in this case. I will deny the motion for a new trial based on ineffective assistance of counsel. I, I think the trial record supports Mr. Blake's competency.

If the Court of Appeals feels otherwise, I guess they can send him back, but right now I'm disinclined to order a *Ginther* hearing.

The record shows that trial counsel timely moved to have Cross evaluated for his competency to stand trial and to waive his *Miranda* rights. It was not until July 15, 2016, that defense counsel was aware that Cross had been determined to be competent to stand trial. Based on that assessment, and the likelihood that Cross would also be found competent to waive his *Miranda* rights, the trial court suggested to defense counsel that if he wanted an independent evaluation, he should obtain one soon because the trial date was approaching.

The existing record shows that for unknown reasons, Cross's family retained Kaye through another attorney without involving trial counsel. Kaye's evaluation states that she met with "defense counsel" on August 27, 2016, and attempted to first interview Cross on August 28, 2016. Cross's trial began on August 30, 2016. Kaye apparently was not allowed to enter the jail to evaluate Cross until September 2, 2016. It was not until September 6, 2016, that Cross's trial counsel requested that the trial court consider Kaye's evaluation regarding Cross's competency. Cross's trial concluded on September 7, 2016.

The record supports the statements made by trial counsel that Cross's family had procured the services of a second attorney who hired Kaye to evaluate Cross. There is no evidence contradicting trial counsel's statements to the court that he was unaware that the family had taken these steps until he was presented with a copy of Kaye's evaluation. Likewise, there is no evidence, such as an affidavit from Cross's family members or trial counsel, to support any claim that there was a plan to have the family fund an independent evaluation as part of Cross's defense strategy, other than a brief comment at the hearing on August 24, 2016, that the family had hired someone to possibly conduct an independent evaluation. Rather, the record indicates that the family decided to retain the services of a psychologist to perform an independent evaluation through another attorney who was not working with trial counsel. There is no evidence or an offer of proof that Cross mentioned the independent evaluation to defense counsel at any point before the results of the evaluation were provided to counsel during trial.

Because the record shows that trial counsel was unaware that Cross's family had actually obtained an independent evaluation to challenge his competency, we cannot conclude that trial counsel was ineffective for not timely offering Kaye's independent evaluation to the court.

In any event, Cross has not demonstrated a reasonable probability that the outcome of the case was affected by counsel's failure to obtain an independent evaluation. The video recording of Cross's interview shows that the officers who interviewed him took appropriate steps to make sure that he understood his constitutional rights after he told them that he suffered from a learning disability. Although Cross may have had difficulty reading and writing, the officers read his rights to him and confirmed that he understood each right. Cross sought explanations of his right to remain silent and whether the cost of an attorney would be paid by the state. After additional explanation, Cross confirmed that he understood these rights and wanted to talk to the police. Nothing in the interview supports a conclusion that Cross lacked the ability to comprehend the rights he was waiving by agreeing to talk to the police. In fact, as the trial court observed, Cross appeared eager to give the police his account, which largely minimized Cross's role in the offense and shifted the blame to others.

Furthermore, the CFP evaluation of Cross's competency to waive his rights found that Cross possessed the intellectual capacity to make a valid waiver and that he attempted to misrepresent his academic abilities and his psychiatric symptoms. Given the evaluations by the CFP regarding Cross's competency, in addition to the contents of the actual interview, Kaye's evaluation was not reasonably likely to change the trial court's rulings regarding Cross's motion to suppress and his competency to stand trial. While Kaye concluded that Cross was intimidated by authority figures and lacked the intelligence to comprehend waiving his right to counsel or to remain silent, the video recording does not show that the officers used intimidation tactics to coerce his statement, and it shows that the officers endeavored to answer Cross's questions and explain his rights to him. The record shows that trial counsel considered seeking an independent evaluation, but was unlikely to obtain funding for an independent evaluation at state expense because he had been retained, see *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010) (counsel is not ineffective for failing to advance a meritless position), and that counsel was not timely informed of the family's involvement in obtaining an independent evaluation.

In sum, although Cross claims that it was objectively unreasonable for counsel to proceed to trial before Kaye's evaluation of Cross had been completed or presented to the court, the record shows that Cross and his family did not apprise counsel of their efforts to hire Kaye. Under the circumstances, trial counsel cannot be faulted for not seeking an adjournment to procure or present the evaluation in a timelier manner. Further, even if trial counsel should have done more to procure an independent evaluation, Cross has not shown a reasonable probability that the outcome was affected by the failure to procure an independent evaluation of Cross's competency to waive his constitutional rights or to stand trial.

Although Cross contends that this matter should be remanded for an evidentiary hearing, he has not submitted any affidavits or other offers of proof showing that there are underlying issues of fact that must be resolved before this Court can decide whether counsel was ineffective.

See *McMillan*, 213 Mich App at 141-142; *Simmons*, 140 Mich App at 685. We are not persuaded that remanding for an evidentiary hearing is warranted.

## IV. CONCLUSION

We affirm defendants' convictions in both appeals.

/s/ Christopher M. Murray
/s/ Stephen L. Borrello
/s/ Amy Ronayne Krause